**CASTRO DECORATORS, INC., Plaintiff,**

v.

**BEBRY BEDDING CORPORATION, Defendant.**

**CASTRO DECORATORS, INC., Plaintiff,**

v.

**R. H. MACY & CO., Inc., Defendant.**

**Civ. Nos. 15225, 15226.**

United States District Court
E. D. New York.

Jan. 18, 1960.

Curtis, Morris & Safford, New York City, for plaintiff, Robert D. Spille, Arthur V. Smith, John A. Mitchell, New York City, of counsel.

Keith, Bolger, Isner & Byrne, New York City, for defendants, Thomas J. Byrne, Jr., Paul S. Bolger, New York City, of counsel.

BRUCHHAUSEN, Chief Judge.

The plaintiff instituted the above entitled actions, now consolidated, for infringement of a patent and breach of an oral supply agreement. The defendant, Bebry Bedding Corporation, is a manufacturer of beds and the defendant, R. H. Macy & Co., Inc., was a customer of Bebry and a retailer of the accused product.

The defendant Bebry counterclaims for infringement of its patent, breach of the supply agreement and for unfair competition.

The subject matter of each patent is a convertible hassock and bed, otherwise described as a convertible footstool (or ottoman) and bed. The mechanism is so constructed that the footstool, by a simple manual operation, may be converted into

a bed and vice versa. Thus, a footstool may be transformed into an emergency bed.

The ottoman bed is now in wide use. It has been heavily advertised in recent years. In earlier years, the davenport, an upholstered sofa, convertible into a bed had been in common usage. It has been largely replaced by the ottoman bed.

■ The principal issue is whether Creveling and Pennell (Castro's assignors) or Bebry invented the ottoman. The plaintiff's claim is based on patent No. 2,664,145, filed on December 5, 1951, issued to Catherine B. Creveling and Elmer V. Pennell, assigned to plaintiff and reissued to it, hereinafter referred to as the Creveling patent.

The defendant, Bebry, contends that its patent No. 2,785,416, filed December 3, 1953, is the only valid patent in the field.

The entrance of Bernard Castro, the founder and president of the plaintiff company, into the furniture business, his experience and his dealings with Mrs. Creveling, Bebry and his company, Bebry Bedding Corporation, are relevant.

Bernard Castro emigrated to New York from Italy some forty years ago, studied English at night school, took courses in design and upholstering, worked himself up to the position of foreman, supervising 40 to 50 men and then founded his own business. At first he devoted attention to the re-designing and re-upholstering of sofa beds and later specialized in the design and sale of convertible beds. The plaintiff's company now has 38 retail stores, supplied in part by its own upholstering, wood frame, steel mechanism and assembly parts. It is a substantial advertiser, expending over $1,500,000 yearly therefor.

Castro commenced doing business with Bebry in 1947. Bebry, a manufacturer of steel frames for beds and related products, became Castro's major source of supply.

In the summer of 1951, Mrs. Creveling and her associate, Mr. Pennell, submitted to Castro a model of an ottoman bed.

The latter expressed interest but thought it too crude in appearance. During the following summer (1952) several events took place. Creveling and Pennell exhibited to Castro another model of an ottoman which he accepted. Shortly thereafter, during that summer, Castro showed the model to Bebry and entered into an oral agreement with him, whereby Bebry undertook the sole manufacture of the ottoman for Castro. About that time, Bebry was of the opinion that the article was unsaleable and sought to dissuade Castro from paying royalties to Creveling. In this connection, Castro testified (R. 106–114), viz.:

"You, see, Mrs. Creveling and Mr. Pennell, they invented the ottoman. They brought it to us. Now, I couldn't tell exactly then and there what their royalties were going to be to her, because I didn't know what the thing was going to cost. So I told Mrs. Creveling at that time, I says, the moment the first few come off the assembly line we will sit down and talk business. And all the time Mr. Bebry knew that I was doing business with Mrs. Creveling. He knew we had reached an agreement that we were paying a royalty to Mrs. Creveling.

"And Mr. Bebry himself all the time used to tell me, why you want to pay a commission—royalty to that woman for. I said it is her ottoman. He says, look—I says well, she is liable to sue us if we don't pay her. He says, 'don't worry about that. If she sues us I will handle it with my lawyers.'

\*  \*  \*  \*  \*  \*

"So finally we got to the point where he (Bebry) said it will take a lot of money for dies, and this and that, to make the thing. I don't think it is going to make much of an item. But if you want it you have to give me an order for about a thousand.

\*  \*  \*  \*  \*  \*

"He didn't like the idea at all. He thought we wouldn't sell but a handful."

Thereupon Castro placed an order with Bebry for the manufacture of 1,000 ottomans (R. 106). It was during this initial conversation that Castro informed Bebry that he was going to pay royalties to Mrs. Creveling (R. 115).

Castro forthwith delivered the Creveling model to Bebry, but not until more than a year later, October 1953, did Bebry send to Castro the manufactured model of the ottoman.

Apparently Bebry's pessimistic attitude toward the ottoman as a saleable article had by that time undergone a drastic change, so much so that a few months later, in December 1953 he filed his application for a patent.

Bebry failed to inform either his patent attorney, Mr. Clark, or the Patent Office that he had the Creveling model in his possession. Furthermore, the defendant's expert, Hughes, conceded that the objects or purposes of the Bebry patent were achieved by the original Creveling model and that Bebry's claims covered it. (R. 602–607)

■ The defendants at first contended "anticipation" of the Creveling patent by twenty-two prior patents, but eventually narrowed down to four of them, i. e., Freedman (1918), De Does (1918), Lamb (1928) and Frank (1934). They submitted no evidence that any of them had functioned or operated. In fact their expert, Hughes, doubted their operability without substantial re-design (R. 526–540). This factor renders them nonanticipatory. Babcock & Wilcox Co. v. Springfield Boiler Co., 2 Cir., 16 F.2d 964, 969. Furthermore, Freedman, upon which patent defendant principally relies for anticipation is definitely not an ottoman which involves an accordion pleat action in its operation, but a davenport or sofa bed of the conventional roll-over type. It does not incorporate the Creveling counter balancing and assisting springs. None of those patents was anticipatory.

■ The testimony of David C. Laemmle, a vice president of Bebry, is persuasive evidence that the ottoman was not obvious even to those closely allied with the bed business, as he had been for many years. He conceded that Bebry had never manufactured an ottoman. He and his company's nearest approach to it was a chair bed, conceived in 1939, which apparently was impractical or unmarketable and eventually discarded (R. 351–353). This is demonstrative of the situation generally. No one had produced a successful ottoman. The long elapse of time between the alleged prior art patents and Creveling shows that the latter was not "obvious." Waring Products Corp. v. Landers, Frary & Clark, 2 Cir., 263 F.2d 160. However, when Bebry apprised Macy's of the availability of the accused ottoman bed, Macy's immediately placed it in stock, displacing a prior article worked on a different principle. The commercial success of the Creveling (Castro) bed has been phenomenal. Over 25,000 have been marketed within the past two years at a total gross of about $2,000,000, surely an indication that the article was not obvious to the experts or anyone else.

Visual inspection of the beds, the motion pictures and the still pictures, all in evidence, reveal the similarity between the Creveling and Bebry beds. Exhibit 8 (5 photographs) shows the Creveling model (Ex. 3) in its various stages of operation. Exhibit 9 (5 photographs) depicts the operations of the accused Bebry model (Ex. 4). Exhibits 10 and 11 are photographs of Castro (successor to Creveling) models (Exhibits 5 and 6). The photographs illustrate that both of the said beds fold and unfold in the same manner by means of a Z accordion pleat action. Both beds are similar in appearance when folded and unfolded. Each of the said beds is composed of three major bed sections of equal size, a folding mattress pad, a smaller non-folding mattress pad abutting the larger pad and an automatic headboard.

An additional element, common to each of the beds, the subject of considerable

testimony by the expert witnesses, pertains to the means of raising or lowering the inner or head section of the bed, referred to in technical language as "the expansible and contractible means." Hughes, the defendant's expert, clearly a professional witness, an electrical engineer inexperienced in the convertible furniture field, sought to establish that the criss-cross legs in Bebry were novel and not present in Creveling; that they and the Creveling single toggle lever are based on entirely different principles and constitute different structures (R. 257). The credible evidence and his later admissions on cross-examination completely refute the contention. Bebry's attorney, Mr. Clark, conceded to the patent examiner that "a cross leg supporting structure in a collapsible bed seat construction is not new, it is cited in the French Patent". (P. Ex. 13). Hughes, when pressed on the point, finally admitted that "expansible and contractible means" aptly defined both structures (R. 605–607).

 Plaintiff's expert, Willis, highly experienced in this field, well sums up the credible evidence that the criss-cross legs are an extended toggle; that the principle of operation of the criss-cross legs and the Creveling toggle is the same, i. e., to raise the inner section of the ottoman bed to the sleeping position (R. 58–73). While Bebry did not copy Creveling in every detail, such as substituting criss-cross legs for the Creveling toggle, he devised a bed for the doing of the same work as Creveling and thus accomplished substantially the same result. This constitutes infringement. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097. Bebry's substitution was a distinction without a difference. This was further demonstrated in the hair-splitting testimony of defendant's expert Hughes, when called upon to define a toggle. Even he was unable to distinguish between the effect of the cross legs and the toggle.

Bebry counterclaims against Castro for the breach of their oral agreement. It is not disputed that Castro orally agreed to purchase 1,000 ottomans, manufactured by Bebry; that the transaction was consummated; that Bebry agreed not to sell ottomans to anyone but Castro. Not conceded is the claim of Bebry, through its witness David C. Laemmle, that Castro also agreed not to manufacture ottomans. The testimony of Laemmle and Harley, a former employee of Castro and a major customer of Bebry, is unconvincing. Neither of them was present when the agreement was entered into. Laemmle testified that when he learned Castro was manufacturing, in violation of his alleged agreement, he (Laemmle) sold an ottoman to Macy's (R. 283), yet on cross-examination, he stated that he did not know whether Castro had sold any ottomans manufactured by the latter's company (R. 342). It is clear that Bebry, not Castro, breached the agreement.

Judgment for plaintiff is granted. Settle findings and decree on five days' notice.