**SPERRY RAND CORPORATION**

v.

**TEXAS INSTRUMENTS INCOR-
PORATED.**

Civ. No. 8297.

United States District Court
N. D. Texas,
Dallas Division.

May 28, 1962.

---

Locke, Purnell, Boren, Laney & Neely, by Stanley E. Neely, Dallas, Tex., Brumbaugh, Free, Graves & Donahue, by Walter H. Free and Frank W. Ford, Jr., New York City, for plaintiff.

Thompson, Knight, Wright & Simmons, by Sol Goodell and Richard E. Gray, Jr., Dallas, Tex., Stevens, Davis, Miller & Mosher, by Robert F. Davis, Washington, D. C., Samuel M. Mims, Jr., Texas Instruments Incorporated, Dallas, Tex., for defendant.

DAVIDSON, District Judge.

This is a patent case in which the plaintiff alleges the infringement of a patent setting forth a purported discovery developed during one of the most historic periods of the nation history.

Pearl Harbor had just gone over. The President had said, we are now in total war. He summoned the manpower of the nation in every line and capacity. A group of technicians and scientists were assembled, including universities and industries employing and having technicians at their command. The members of the group were the personnel of Purdue University, the University of Pennsylvania, Massachusetts Institute of Technology, General Electric Company, Westinghouse Company and the American Telephone and Telegraph Company, particularly its subsidiaries, Bell Telephone Laboratories and Western Electric Company, which members comprised and worked under the National Defense Research Committee.

This committee would have conferences and then each would make experiments and in writing, but in confidential form, advise the other members of the group the result of his experiments. Then they would hold another conference and consider the things that were suggested by the experiments. And the laboratory tests would be further administered. This continued during 1942 and a great portion of 1943.

One of the members of that group was Dr. John R. Woodyard who was a scientist and employee of the Sperry Gyroscope, now the plaintiff in this case.

The plaintiff contends that Dr. Woodyard made the discovery of the matters contained in his patent. It is insisted and evidence is offered by defendant to the effect that the discovery was the work of the united group in their various undertakings.

Plaintiff to sustain its claim offers its patent in evidence and stands by its validity.

In contesting the validity of that patent the burden of proof is on the defendant to show by clear and convincing evidence that in fact the invention claimed was not invented by Dr. Woodyard but was in fact invented by the group or another member of the group.

While the record is abundant, there are three or four occurrences particularly controlling on the question of who in fact first originated a germanium rectifier containing a nitrogen group impurity of less than 1%.

Reference has been made by both sides to a sample given Dr. Angello of Westinghouse on April 21, 1942. Given spectroscopic analysis, the sample showed a composition of germanium with about 1% bismuth (a nitrogen group element) included. After analysis, Dr. Angello found the sample exhibited rectifying properties. It is contended by plaintiff that Dr. Angello received this sample from Dr. Woodyard, this by inference showing Dr. Woodyard's awareness of its make-up. However, Dr. Angello testified positively that Dr. Woodyard did not disclose to him the contents of the sample.

At this same time, Dr. Angello examined a Westinghouse sample referred to as "Wilson's germanium." The analysis of this sample also showed the presence of bismuth. It is then seen that these salient samples, exhibiting rectifying properties, originated not from Dr. Woodyard alone, but from Dr. Woodvard and Westinghouse Company.

Dr. Angello conveyed the results of his work to other members of the research team.

It was further argued that at the time these samples were examined for content the lines of the spectrograph were probably misread and that the samples contained germanium with a 1% impurity of arsenic. The testimony of experts on this point revealed that the spectroscopic lines for both bismuth and arsenic were similar, not readily distinguishable, and that arsenic was a common impurity in raw germanium.

The second pertinent fact related to the meeting of May 11, 1942 at Sperry. Present at the meeting were Dr. Woodyard and Dr. Lark-Horovitz among others. On the same day the evidence shows that Dr. Horovitz sent a telegram to his assistant Dr. Yearian at Purdue University containing instructions to add 1% bismuth to germanium.

Looking to the written evidence in this case, the notebooks of the Sperry Company and Dr. Woodyard were brought into evidence. No reference was found in any of those reports concerning the addition of a nitrogen group impurity to germanium until December 6, 1942 in the notebook of Dr. Woodyard. All other references to germanium concerned its purification only with the exception of one reference in April 1942 by Dr. Woodyard that germanium had similar properties to silicon which probably noted the results of Dr. Angello's analysis.

Dr. Woodyard himself testified but was unable to state of independent recollection that he had added a nitrogen element impurity to germanium and stated further that his activities might have been merely the verification of the results of others.

While on the witness stand, as it must also appear from the record, it became apparent that Dr. Woodyard had been absent from this field of endeavor some 20 years as a teacher in a university and that his memory was somewhat hazy on numbers of questions propounded and in this connection his notes that he made at the time were introduced in evidence which are not copied in this opinion but are contained in briefs of parties from which it appears nowhere affirmatively anything that contradicts his admission to the effect that "at this time I couldn't say whether I verified the results of others or did the addition myself."

Thusly, from a review of the evidence and from the activities of these various men covering almost two years of investigation we are forced to the conclusion that the discovery as set forth in the Woodyard patent is the work of this

joint group of investigators doing research at the instance of the government.

The evidence is clear and convincing that the work of such committee was not the work of any one person and nowhere can it be shown that it was the work of Dr. Woodyard.

■ Although a number of angles and different elements enter into this controversy we think the case must turn on the foregoing conclusion as stated that it was not the work or child of the mind of Dr. Woodyard but that of the group.

Passing to the second phase of the case, the Court is of the opinion from the record before it that though the Woodyard patent be treated as a valid document of the Patent Office, still the evidence does not disclose an infringement thereof.

Under the rule of Graver Tank & Manufacturing Company, Inc. v. Linde Air Products Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950):

"* * * resort must be had in the first instance to the words of the claim. If the accused matter falls clearing within the claim, infringement is made out. * * *"

Claim 10 of the Woodyard patent is asserted as the basis for infringement. Claim 10 reads as follows:

"10. Unidirectionally conducting apparatus comprising a member, a first conductor in contact with a part of said member, and a second conductor in contact with a different part of said member, said member being constituted of a germanium base alloy, said alloy having a minor constituent constituted of one or more elements of the nitrogen group, said alloy containing 99% and less than 100% of germanium, said alloy further containing 1% or less of said minor constituent."

The issue of infringement is then whether the transistors produced by the defendant are within the coverage of Claim 10.

Claim 10 begins with the phrase "unidirectionally conducting apparatus."

Looking to the patent as a whole this is construed to mean electrical current rectifiers. As that phrase has been defined before the court it means a device which permits an electric current to flow in one direction and prohibits its flow in the opposite direction. There is no such restriction in a transistor, since the current flows both ways. Also, while the purpose of a rectifier is to control the direction of current flow, the purpose and paramount use of transistors is for amplification. Further, the transistor as produced by Texas Instruments uses a PN junction as opposed to the N-type germanium base of the patent. There is no reference in the patent to the use of PN junctions or P-type germanium bases.

The most convincing proof of non-infringement is the fact that Drs. Bardeen, Brattain and Shockley of Bell Telephone Laboratories received the Nobel Prize for their invention of transistors which is the instrument manufactured by the defendant involved in this controversy.

It is therefore the finding and opinion of this court, first, that the Woodyard patent relied upon by plaintiff was not the product of his invention but rather that of a group of scientists caused to be assembled by the United States government who conferred together for the greater part of two years, it being the product of their many experiments and combined wisdom and findings and therefore the patent is not one that can be sustained and subject to infringement.

Second, we are of the further conclusion that although we might treat the patent as a valid document as an instrument from the Patent Office of the United States, still plaintiff has not sustained the burden of proving that the patent embraces the elements of a transistor manufactured by defendant. And though the Woodyard patent be a valid document, there would be no infringement as it would not within itself constitute a transistor.

This being a fact case no authorities are cited.

Judgment for defendant.