**BURGESS CELLULOSE COMPANY,**
Plaintiff-Appellant,

v.

**WOOD FLONG CORPORATION,**
Defendant-Appellee.

No. 710, Docket 31481.

United States Court of Appeals,
Second Circuit.

Argued April 22, 1970.

Decided July 24, 1970.

J. Joseph Smith, Circuit Judge, concurred in result and filed opinion.

———◆———

Edward A. Haight, Chicago, Ill. (Haight, Hofeldt & Davis, Chicago, Ill., Joseph C. Sullivan, Kane, Dalsimer, Kane, Sullivan & Smith, New York City, Howard H. Darbo, Darbo, Robertson & Vandenburgh, Arlington Heights, Ill., on the brief), for plaintiff-appellant.

William H. Vogt, III, New York City (John T. Kelton, Stevan J. Bosses, Watson, Leavenworth, Kelton & Taggart, New York City, on the brief), for defendant-appellee.

Before MOORE and SMITH, Circuit Judges, and WEINFELD,* District Judge.

* Of the Southern District of New York, sitting by designation.

MOORE, Circuit Judge:

The appellant, Burgess Cellulose Company, is one of four manufacturers of stereotype mats in the United States. Two of the other manufacturers are licensed by Burgess under the patent in suit. The remaining manufacturer, Wood Flong Corporation, has not been licensed by Burgess and is being sued for patent infringement.

A stereotype mat is used in the casting of the metal cylindrical rolls of a printing press. It consists of a relatively thick sheet of felted cellulose fibers, a fine powder filler, and a coating. The text to be printed is composed in a flat form which is then impressed upon the stereotype mat. The mat is moist and plastic when it receives the impression. It is then curved and scorched or dried to produce a hard and smooth mold for the casting of the cylindrical rolls.

The stereotype mat, sometimes called matrix paper or flong paper, has been in used for many years. Commonly employed fillers included powdered clay, talc, and diatomaceous earth. The patented stereotype mat is manufactured in the usual way with the innovation that the patent teaches being the use of a synthetic silicate as a substitute for naturally occurring substances used as fillers.

The patent in suit, Patent No. 2,739,068, was issued to Russell R. Eichmeier, a Burgess employee, and assigned to Burgess. His use of synthetic silicates as a filler in stereotype mats was initiated when he saw an advertisement on the back cover of the February, 1949 issue of TAPPI, a trade publication in the pulp and paper industry. The advertised product, Silene EF, was described as "a white, very finely divided, precipitated hydrated calcium silicate" with a bulk density of 15 to 16 lbs. per cubic food. The advertisement invited the recipients of the magazine, all members of the Technical Association of the Pulp and Paper Industry, to "explor[e] the possibilities which Silene EF may afford your products." Eichmeier obtained a sample of the product and it immediately produced good results as a stereotype mat filler.

A patent application was filed in 1950. The file wrapper reveals that patent office objections were based on obviousness in the light of prior disclosures in the art of paper products. The application was finally allowed in July of 1954, but at the same time, Burgess learned of the manufacture of synthetic silicates by Johns-Manville Corporation. Burgess experimented with the Johns-Manville product, Micro-Cel, 500 Series, and found that it gave promise of being a superior filler. Therefore, Burgess filed a "continuation" of the original application to include claims which it hoped would cover Micro-Cel.

Burgess employed the Armour Research Foundation in Chicago to determine what filler properties affected stereotype mats. As a result of the hurried research conducted to take advantage of the 1950 filing date, the amended application was drafted to add claim eight, which described the filler as containing:

"as an essential constituent, a synthetic alkaline earth metal silicate exhibiting the following characteristics: a surface area of at least 10 square meters per gram * * * and a substantial amount of said silicate being in the amorphous state as determined by * * * the X-ray diffraction pattern * * *."

The original application had described the filler as a "precipitated synthetic silicate." To avoid the prohibition of new matter in amendments, 35 U.S.C. § 132 (1964), Burgess argued that the eighth claim merely described the earlier disclosed filler in terms of its physical characteristics, rather than in terms of its method of manufacture. The amended application was allowed on Burgess' representation that the application was "identical with the parent application." The patent was issued on March 20, 1956.

Johns-Manville subsequently produced a synthetic silicate called "Micro-Cel T-26." In January of 1958 Johns-Manville suggested to Wood Flong that it use the Micro-Cel silicates as a filler in stereotype mats. Wood Flong has been using Micro-Cel T-26 since July 1959. This use is the basis of the alleged infringement.

The district court held the patent invalid under 35 U.S.C. § 103 since the prior art made the subject matter obvious to a person having ordinary skill in the art to which the subject matter pertains. The art relating to paper making was found to be analogous to the manufacture of stereotype mats. Having examined the prior art, the district court found that the patent in suit was not a sufficient advance to constitute invention. The patent merely substituted "an old and known material, a synthetic precipitated alkaline earth metal silicate, for other fillers in an old and known product, stereotype dry mat."

The district court, assuming *arguendo* that the patent was valid, also passed on the claims of infringement. It found that there was no literal infringement of the patent claims. Claims one through seven, derived from the original application, required that the filler be precipitated. Claim eight was allowed on the representation that it was merely an alternative description of the same material disclosed in the original application. The district court held that to avoid invalidity for having introduced new matter, claim eight must be limited to precipitate material. The infringing mate-

rial—the Micro-Cel T-26—had not been established to be a precipitate.[1]

The court also held that even if claim eight did not require a precipitate, Micro-Cell T-26 did not literally infringe since it did not show an amorphous ring on the X-ray diffraction pattern.

■ In spite of the findings that there was no literal infringement, the district court held that if the patent is valid, there is infringement under the doctrine of equivalents. That doctrine applies where the infringing product performs substantially the same function in substantially the same way to obtain the same result as the patented product. E.g., Graver Tank and Mfg. Co. v. Linde Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

The history of the formulation of the conditions of patentability has been discussed by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The traditional conditions of novelty and utility were supplemented in Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851) by the condition that a patentable invention reveal more ingenuity and skill than that possessed by an ordinary mechanic acquainted with the business. In the 1952 Patent Act, Congress incorporated the *Hotchkiss* requirement into section 103 which states "nonobviousness" as an explicit condition of patentability.[2] In interpreting section 103, the Court said:

"Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and

---

1. The T–26 manufacturing process involved the combination of two slurries in a reactor for two hours under heat and pressure. A first stage product (CSH–1) which is made in four minutes might be called a precipitate, but the final product (CS–55 or Micro-Cel T–26) is concededly the result of a solid state reaction. This later reaction is a chemical and not a mechanical change.

2. 35 U.S.C. § *103. Conditions for patentability; nonobvious subject matter:*

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. at 694 (1966).

■ Applying the standards of obviousness in section 103 and in the *John Deere* decision, we agree with the district court's determination that the patent is invalid.[3]

■ In examining the prior art we should not expect to find a pat reference to the specific use of synthetic silicates in stereotype mats to produce the improvements claimed in the patent. Such an anticipation would mean that the invention did not possess the novelty required by section 102 as a condition of patentability. Novelty in this sense was conceded. The question of obviousness is distinct from that of novelty. A device may be new and useful and yet still not be patentable if an examination of the technology of the prior art and the ordinary skill of the artisan reveals that the new and useful innovation is obvious.

The prior art revealed several propositions which, in combination even though not individually, would lead the person having ordinary skill in the art to the use of synthetic silicates in stereotype mats. The O'Neil patent 1,989,709, the Dicalite Bulletin F-51 and the Paper Trade Journal article (DX AH) teach that diatomaceous earth is useful as a filler in paper products. Although none of these sources specifically discusses stereotype mats (and indeed should not be expected to), each discusses the characteristics of the material which result in such improvements as "increased retention of fine fibers," "faster drainage and improved vapor release," and "bulking due to low density." The characteristics of diatomaceous earth made it the filler which was relied upon in the manufacture of stereotype mats, as shown by its use by both parties prior to the innovation in question. The prior art also revealed that synthetic calcium silicate was a substitute for diatomaceous earth. The 1926 Calvert Patent No. 1,574,363 (DX AH) related to the production and use of synthetic silicates for filtration, decolorizing and purification. The patent recognized that the disclosed product would be adopted for use as a substitute for diatomaceous earth "as an absorbing material, for a filler, or for heat insulation." The 1869 Johnson British Patent No. 404 and the 1936 Smith Patent No. 2,237,374 (DX AH) reveal that the use of synthetic precipitated alkaline earth metal silicates as fillers in paper products was known. Although the object of the Smith Patent is to provide a filler with "high brightness and high opacity combined with a low cost," it nevertheless revealed that precipitated silicates had been used as paper fillers.

The specific improvements which the use of synthetic silicates produced were

---

3. The Court in *John Deere, supra* at 17, 86 S.Ct. 684, 694, recognized that the ultimate question of patent validity is one of law, citing Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162 (Douglas, J., concurring), but stated that the nonobviousness condition "lends itself to several basic factual inquiries." The findings of fact by the district court are to be reviewed in accordance with the "clearly erroneous" standard Rule 52(a) of the Federal Rules of Civil Procedure, but the "standard of invention" applied is reviewed as a matter of law. Compare Graver Tank and Mfg. Co. v. Linde Co., 336 U.S. 271, 274–275, 69 S.Ct. 535, 93 L.Ed. 672 (1949) with Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153–154, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

"a pronounced increase in the moist-plasticity of the mat * * *, together with the other benefits of improved smoothness of surface, release of moisture during drying, flexibility when dry, etc., without any sacrifice in other desirable properties such as strength, toughness, harness of surface when dry, normal shrinkage, etc."

Eichmeier Patent No. 2,739,068 (PX 2). Eichmeier testified that he knew that fillers had a beneficial effect in stereotype mats and that a finely divided material of law bulk density would be worthy of investigation by one in the art (JA 55a–57a; 228a). Wood Flong's expert witness, Frederic W. O'Neil, a professor at Syracuse University teaching in the field of pulp and paper technology, testified that the characteristics required of fillers for use in stereotype mats included low bulk density to give a bulkier, softer sheet to take indentations, a fine particle size, and easy movement of vapor through the sheet to allow easier drying and scorching (JA 202a–203a; 190a). These are the characteristics of Silene EF, as advertised in the February, 1949, issue of TAPPI, when precipitated calcium silicates first became commercially available. A person having ordinary skill in the art would be aware of the old, diatomaceous earth-filled mats and their deficiencies. He would also be charged with the knowledge in the prior art that synthetic precipitated silicates possess superior qualities over diatomaceous earth in precisely those characteristics which would yield a better stereotype mat. The inclusion of synthetic silicates, a material with known, superior qualities, as a substitute for diatomaceous earth in the well-known procedure for making stereotype mats is merely to conduct experimentation on the level of ordinary skill in the art. It does not meet the stringent test of nonobviousness that is to be applied to patents on combinations of materials. See, e.g., Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Indiana General

Corp. v. Krystinel Corp., 421 F.2d 1023 (2d Cir. 1970), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

Burgess argues that a person having ordinary skill in the art of stereotype mat making should not be expected to seek useful information in the art of paper making. It states that the art of paper making is not "analogous" or "pertinent" to the art of the patent in suit. A sufficient definition of the pertinent art, as adopted by the parties in their briefs, is "the art to which one can reasonably be expected to look for a solution of the problem which the patented device attempts to solve." Kitch, Graham v. John Deere Co.: New Standards for Patents, 49 J.Pat.Off.Soc'y 237, 292 (1967). Burgess contends that the problems solved by the innovation "were not paper making problems; they were mechanical molding and metal casting problems." Brief for Appellant at 18, paraphrasing Graham v. John Deere Co., 383 U.S. 1, 35, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Admittedly there is a difference between the purpose and function of fillers in each separate paper product. One would not expect the same filler to give superior results when used in paper for writing, printing, wrapping, insulating and stereotype mat making. Yet one would expect the pulp and paper industry to have investigated the characteristics of various fillers. Therefore one should be expected to look at the paper making art to find a solution to the problems presented in making a superior stereotype mat. Paper making is a pertinent art.

Burgess also relies upon the so-called "sub-tests of nonobviousness" such as commercial success, long felt but unsolved needs and failure of others. The Court in *John Deere, supra,* commented that these subtests

"serve to 'guard against slipping into use of hindsight,' [citation omitted] and to resist the temptation to read into the prior art the teachings of the invention in issue." 383 U.S. at 36, 86 S.Ct. at 703.

Burgess points to the evidence that the idea of using synthetic silicates did not occur to Wood Flong until ten years after the Eichmeier discovery and then only when it was suggested by a Johns-Manville representative, and that all three of the other manufacturers of stereotype mats began using Eichmeier's discovery when it became known to them, two of the three paying royalties under a license agreement. We are not convinced that the fact that the discovery produced an improvement necessarily implies that there was a "long felt need" which others had sought unsuccessfully to fulfill. Cf. Technical Tape Corp. v. Minnesota Mining & Manufacturing Co., 247 F.2d 343 (2d Cir. 1957), cert. denied, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1958). Nor are the licenses to use the patented combination of materials particularly significant, as recognized by the district judge, in establishing validity of the patent. These licenses contained escape clauses which refused to admit vaildity of the patents. The sub-tests do not here demonstrate that the innovation would not be obvious to a person having ordinary skill in the art after having examined the prior art.

Since we hold the patent invalid under section 103, it is unnecessary to pass upon the questions raised on the issue of infringement. These questions include the scope of the claims and concealment of information raised by the amendment of the application in response to the production of Micro-Cel, whether Micro-Cel T-26 is a precipitate or is amorphous, and whether there is infringement under the doctrine of equivalents.

Affirmed.

J. JOSEPH SMITH, Circuit Judge (concurring in the result):

I concur in the affirmance of the dismissal of the action but on different grounds from those relied on by the majority. On the record here, I think the patent valid, but not infringed.

The flong making art is quite separate from the general paper making art. The use for which the flong is designed, stereotype dry mats for casting metal printing plates is quite different from the usual writing, wrapping and bagging uses of paper. The qualities sought from the fillers are also quite different from the opacity, strength and similar qualities sought in the more ordinary paper types.

The advance found in this separate art was a dramatic improvement in casting qualities by the use of synthetic earth metal silicates in place of the natural earth substances including diatomaceous earth.

The prior art relied on had nothing to do with the provision of flexibility in stereotype mats and accuracy in casting. The TAPPI ad was directed to paper making generally and the possibility that the synthetic silicates would find a use to replace fillers for the usual paper making purposes.

That their use for mats was not obvious is borne out by the fact that Eichmeier alone tried them for use in the mat art and only after his success did others, some nine years later, come to use them.

I agree, however, with the district court that the patent, the claims of which must be construed quite narrowly in view of the Patent Office history, does not literally read upon the Micro-Cel T-26, since it is not a precipitate nor amorphous. In view of the history, on the other hand, I would not agree with the trial court's dictum that there is infringement under the doctrine of equivalents, since the effect of application of the doctrine here would be to reinstate that which in effect has been abandoned to obtain allowance of claim 8.