**FISCHER & PORTER COMPANY,**

v.

**James F. HASKETT and Capital Controls Co., Inc.**

**Civ. A. No. 42087.**

United States District Court,
E. D. Pennsylvania.

Jan. 5, 1973.

See also D.C., 323 F.Supp. 917; D. C., 51 F.R.D. 305.

John M. Calimafde, Marvin N. Gordon, Sandoe, Hopgood & Calimafde, New York City, Matthew Ryan, Malis, Tolson & Malis, Philadelphia, Pa., for plaintiff.

Carl Hoppe, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Francisco, Cal., David N. Bressler, Shapiro & Bressler, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

HANNUM, District Judge.

Fischer & Porter Company (F&P) commenced this action for a declaratory judgment that Patent No. 3,220,430, in the name of defendant James F. Haskett (Haskett) and assigned to defendant Capital Controls Co., Inc. (Capital), is invalid, non-infringed, or, in the alternative, the patent is owned by the plaintiff. Capital counterclaimed charging the plaintiff with infringement of said patent. Capital also alleged certain antitrust violations, but the antitrust issues were severed pursuant to Rule 42(b), Fed.R.Civ.P. After a trial on the issues of validity, infringement, and ownership of the Haskett patent, the Court makes the following:

## FINDINGS OF FACT

I *The Parties and Jurisdictional Aspects*

1. Plaintiff, F&P, is a Corporation of the State of Pennsylvania, has a principal place of business in Warminister, Pennsylvania, and is in the business of manufacturing and selling chlorination equipment.

2. Defendant, Capital, is formerly a corporation of the State of Pennsylvania, and has been marged into Dart Industries, Inc., and is now known as Capital Controls Co., Inc. a division of Dart Industries, Inc. Capital has its principal place of business at Colmar, Montgomery County, Pennsylvania, and is engaged in the manufacture and sale of chlorination equipment.

3. Defendant, Haskett, is an individual residing in Warrington, Pennsylvania, and is the patentee of the patent in suit. Haskett has been the president of Capital since its organization in 1960, and is the assignor of the patent in suit to Capital.

4. This suit arises out of an actual controversy between the parties as to the validity and scope of the Haskett patent. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1338(a), 2201, 2202 and under 35 U.S.C. §§ 271, 281. Venue is proper in this district.

II *The Patent in Suit and its Background*

5. U. S. Patent No. 3,220,430 was granted on Novemper 30, 1965 to James F. Haskett for "Chlorinating System" upon an application, Serial No. 280,187, filed May 2, 1963 as a continuation of an earlier parent application, Serial No. 24,053, filed April 22, 1960, now abandoned. (PX 1, 2; DX 74).

6. The patent discloses a method and apparatus for controlling the supply of a chemical treatment fluid such as chlorine for the conditioning or chlorination of drinking water, sewage, etc. The disclosed supply system includes a cylinder of chlorine under high pressure, a vacuum operated diaphragm regulator directly attached to the valve outlet of the cylinder, a flow rate indicator, a metering valve, an emergency shut-off valve (second shut-off valve), an out-of-gas indicator, and an ejector. The pressure in the cylinder is such that the chlorine will be in the form of a gas over liquid. In general the operation of Haskett's so-called chlorinator unit involves supplying water under pressure through an ejector to create a vacuum. This negative pressure creates a predominant force on one side of the vacuum operated diaphragm which causes an inlet valve, connected to the valve outlet of the chlorine cylinder, to open. The pressure of the chlorine is reduced to a

slight negative pressure as it enters the inlet valve of the regulator. The gas then flows toward the ejector through a flow rate indicator and a metering valve which controls the rate of flow. At the ejector the chlorine is mixed with water to form a solution which is injected into the water undergoing treatment. When the supply of chlorine gas has been exhausted the pressure will fall off in the cylinder so that the force created by the vacuum will become even more predominant. This causes the second shut-off valve to close off chlorine flow from the cylinder. The out-of-gas indicator is also activated by the increased vacuum.

7. Chlorinating systems of the general type of the patent in suit have been used for more than 50 years and are exemplified by the Wallace, et al. patent. See finding 33(a).

8. The temperature-pressure curve for liquid chlorine, which indicates the temperature at which chlorine gas will liquefy at a given pressure, was known long before Haskett's invention. It was known that a pressure reducing valve set with reference to this curve would prevent liquefaction of chlorine downstream of the valve at ambient temperatures above the temperature on the curve corresponding to the lower pressure set at the reducing valve. (PX 148 at 23, 28, PX 141, Tr. 561–565, 595–597, 613, 647).

9. It was known that if chlorine gas liquefied, the condensed chlorine would corrode pipes and by depositing dirt would clog small flow orifices such as those used in pressure reducing valves. Those skilled in the art desired to avoid liquefaction of chlorine in the supply line leading from the chlorine cylinder to the pressure reducing valve.

10. Haskett discloses in column 10 of his patent that:

"The common practice previous to my invention has been to connect the pressure or supply cylinder to a chlorinating system by means of flexible connectors, such as copper tubing, and by means of a manifold . . .

The manifold or flexible connectors will cool quickly since they are of low mass and contain the chlorine gas . . . . Attempts have been made to avoid re-liquification [sic] by adding heat to the system.

. . . Conventional connections are usually 4 to 6 feet long and use tubing of ⅜ to ½ inch in diameter."

11. The heart of Haskett's invention is the feature of locating the vacuum regulator in close proximity to the gas cylinder. This feature is referred to as "cylinder mounting". Haskett discloses that by eliminating tortuous and indirect paths or flow of the chlorine gas under positive pressure through flexible connectors, the possibility of leakage of the toxic gas is reduced and the problem of liquefaction is eliminated.

12. The examination of the parent application filed on April 22, 1960, was limited to apparatus claims. The only claims deemed patentable by the examiner were those that recited out-of-gas indicator means in detail.

13. A continuation application was filed on May 21, 1963. The Haskett patent which issued upon this application contains 19 claims. Claims 1–7 are method claims, and claims 8–19 are apparatus claims.

14. During prosecution of these applications before the Patent Office considerable emphasis was placed on the characteristic of chlorine gas to liquefy when flowed under positive pressure and subjected to a reduced ambient temperature. (PX 2 at 104–106, PX 1 at 20, 22, 32, 68, 92, 93, 101, 102).

15. The claims are directed to 6 basic features: a vacuum operated diaphragm regulator, the location of the regulator, a flow rate indicator, a metering valve, a second shut-off valve, and out-of-gas indicator means.

16. The vacuum operated diaphragm regulator is described in typical claim 17 as follows:

". . . a flow-control device defining a fluid control chamber therein, . . ."

". . . a pressure-sensitive diaphragm dividing said chamber into a higher pressure side and a lower pressure side, . . ."

". . . a direct inlet flow passageway . . . for immediately supplying the chlorine under positive pressure to the lower pressure side of said chamber while retaining the chlorine in gaseous form,

a fluid outlet portion carried by said device . . ."

". . . valve means operatively-positioned within said inlet passageway and having resilient means normally urging it to a position closing-off said passageway,

said diaphragm being operatively-carried by said device and connected to said valve means in opposition to said resilient means to open said inlet passageway on an application of negative pressure to said fluid outlet portion for flowing the chlorine under negative pressure and in gaseous form through said lower pressure side of said chamber and out of said outlet portion, . . ."

17. All the claims call for locating the regulator in close proximity to the cylinder.

a. The method claims describe this feature in terms of a limitation on the flow path of chlorine gas under high pressure. This feature is described in typical method claim 5 as follows:

". . . maintaining the pressure flow of the chlorine in gaseous form from the pressure cylinder through the fittings and into the control chamber in a sealed-off relation with the surrounding atmosphere and in a gaseous condition by limiting the maximum length of the flow path from the pressure cylinder to the control chamber to an amount that does not substantially exceed the radius of the cylinder, . . ."

This claimed flow path limitation is supported by the disclosure at column 10, lines 12–21.[1] Haskett does not disclose a specific critical distance in terms of inches or feet but states:

"By, as shown in FIGURES 1 and 2, directly and immediately conveying or flowing the gas under positive pressure from the container D into the control chamber of the unit E, or (as shown in FIGURES 1 and 2 of the drawings) through a path that does not substantially exceed the radius of the container, in other words, by limiting the length of the flow path from the pressure cylinder to the control chamber, I have been able to avoid any liquification [sic] of the gas during its positive pressure flow movement to the control chamber." (col. 10, lines 12–21)

b. The apparatus claims describe this feature in terms of a limited flow path and mounting the regulator on the valve outlet of the pressure cylinder or securing the inlet of the regulator directly to the valve outlet of the cylinder. Typical apparatus claims 10 and 14 describe this feature as follows:

". . . a control unit mounted on the valve outlet of the pressure cylinder, conduit means communicating said control unit with the pressure cylinder through a flow path having a distance that does not substantially exceed the radius of the pressure cylinder. . . ."

Typical apparatus claim 17 describes this feature as follows:

". . . an outlet fitting secured to the outlet portion of the pressure cylinder,

an inlet fitting cooperating with said outlet fitting to provide a sealed-off joint therebetween,

means for detachably-securely supporting said flow control device on said outlet fitting and simultaneously

---

[1]. This language was inserted into the specification in accordance with suggestions made by the examiner in order to put the application in condition for allowance. (PX 1 at 96, 97). The recitation is based on the disclosure in figures 1 and 2 of the drawings.

detachably-securing said inlet fitting in an aligned sealed-off joined relation with said outlet fitting,

a pressure-sensitive diaphragm dividing said chamber into a higher pressure side and a lower pressure side,

said pair of fittings defining a direct inlet flow passageway therealong for immediately supplying the chlorine under positive pressure to the lower pressure side of said chamber while retaining the chlorine in gaseous form, . . ."

The support for these limitations is primarily column 3, lines 52–66, where Haskett states:

"An important feature of my invention is the provision of means to directly install and removably mount the primary unit E on an outlet body for the control or shut-off valve of the supply tank or cylinder D to eliminate connector and adaptor nipples, etc. and any possibility of leakage of the toxic treatment gas during the operation of the unit and the system. In this connection, the unit E (see FIGURES 1, 2 and 5) is positively and securely removably-fastened in an atmospherically sealed-off relationship on a conventional central rectangular body portion 10a of a vertical top or valve outlet pipe or fitting 10 of the cylinder D. Conventionally, a shut-off and control valve is operatively mounted within the body portion 10a and feeds to an integral side or horizontal side outlet portion 11."

18. Another feature of the patented combinations is the flow meter 52 which is included in claims 14 and 17. After describing the mounting for "a transparent, vertically positioned sight tube 52" at column 6, lines 57–58, the Haskett specification continues (lines 58–63):

". . . as shown in FIGURE 3, the sight tube is graduated at 52a in a suitable conventional manner to serve as a flow meter by indicating the rate at which chlorine or other treatment fluid is being supplied, for example,

the number of pounds of chlorine in a 24-hour period."

19. Typical apparatus claim 17 defines the sight tube as follows:

". . . flow indicating means connected between said fluid outlet portion and the lower pressure side of said chamber adapted to visually indicate the rate of flow of fluid from said chamber to said fluid outlet portion . . ."

20. Some of the claims, to wit claims 7, 11 and 14, bring the adjustment or regulator valve 58 into the patented combinations. This valve is shown in Fig. 4 of the drawings and is described in the Haskett specifications at column 6 as follows:

". . . As shown particularly in FIGURE 4, a manually adjustable plug or needle flow-regulator valve 58 is threadably-adjustably carried by the upper mount 54 to extend downwardly along its central bore 54b to regulate the rate of fluid flow therethrough. The plug regulator valve 58 has a knurled head for facilitating its adjustment . . ."

21. Typical apparatus claim 14 describes the metering valve as follows:

". . . a metering valve operatively positioned in said second outlet passageway to regulate fluid from said sight tube to said outlet portion . . ."

22. A feature of claims 1–4, 6, 10–13, and 16–19 is a second valve which is used to shut off the system when the chlorine cylinder becomes empty to prevent water flooding the cylinder. The second valve is described at column 5, lines 21–35 of the Haskett patent as follows:

"The back face of the floating valve member 28 has a backwardly-extending annular seating rim or emergency shut-off valve portion 28a that is adapted to seat upon the gasket 27 when the effective force of vacuum within the chamber increases, due to a fall-off of positive pressure applied to such chamber from treatment fluid

entering from the tank D. In other words, when, for example, the supply of treatment fluid or chlorine gas has been exhausted, the pressure will fall-off in the inlet portion of the unit E, so that the vacuum force becomes more effective. As a result, the floating valve 28 is drawn further forwardly (for example, about 5/64 of an inch), until its valve ring portion seats on the gasket 27 and closes-off fluid flow from the unit E at its inlet portion and thus, from the tank or cylinder D (see FIGURE 6) . . ."

23. In method claims 1, 2, and 3, the step utilizing the second valve is described identically in the following words:

". . . closing-off the positive pressure flow of the chlorine in gaseous form through the inlet fitting into the control chamber when the positive pressure of the chlorine being supplied in gaseous form to the inlet fitting is lowered and negative pressure is being supplied through the outlet portion to the control chamber; . . ."

24. In typical apparatus claim 10, the second valve means are described as follows:

". . . said diaphragm having a second valve means operated by an increase of negative pressure application to said fluid outlet portion to seat about said valve passageway and close-off flow of fluid therethrough, and said diaphragm being sensitive to a fall-off of pressure of the treatment fluid being supplied through said inlet portion to move said second valve means into a fully closing-off position with said valve passageway, . . ."

25. Finally, a feature of several of the claims is the out-of-gas indicator 40. This out-of-gas indicator is best shown in Figs. 3, 6, 10, 11 and 12. It is described in the specification, col. 5, l. 35 to col. 6, l. 23.

26. While the out-of-gas indicator is claimed in detail in claims 9, 16, and 19, none of which is charged to be in-fringed, claims 8 and 13 define the out-of gas indicator more broadly.

27. Claim 8 defines the out-of-gas indicator as follows:

". . . indicator means actuated by movement of said position change means in a direction away from said indicator means to indicate a fall-off of positive pressure at which the treatment fluid is supplied from the pressure cylinder through said inlet portion."

28. Claim 13 defines the out-of-gas indicator as follows:

". . . indicator means . . . operatively associated with said diaphragm and movable within said housing to indicate the closing off of said second valve means to an operator."

## III Validity

29. Plaintiff's complaint seeking a declaratory judgment that the Haskett patent is invalid put all 19 claims of the patent in issue.

30. There has been no stipulation between counsel that the validity of all 19 claims will turn on the validity of certain specified claims.

31. Plaintiff did not introduce evidence challenging the validity of claims 9, 16 and 19 reciting out-of-gas indicator means in detail.

### A. Obviousness
#### 1. Basic Inquiries
##### a. Scope and Content of the Prior Art

32. The art of fluid control is the pertinent prior art to which one would reasonably be expected to look for solutions to problems associated with high pressure flow, pressure reduction and regulation, shut-off means, out-of-gas indicating means, and flow indicating and metering means to which the present invention is directed.

33. Plaintiff has cited several prior art references of interest but has relied primarily on Wallace, et al., Pardee, Everson, Swedish Patent No. 116,969, Victor, Cobb, Hegwein, and Petley. The de-

fendant, patentee, has cited the Peet patent.

### a. Wallace, et al., Patent No. 1,285,496 (PX 47).

This patent was the primary reference cited during prosecution of Haskett's application before the Patent Office. The patent was granted in 1918 and discloses the basic design of a vacuum operated diaphragm regulator employed to regulate the flow of chlorine to purify water. The regulator is divided into two chambers separated by a diaphragm. One of the chambers is vented to the atmosphere to establish a reference pressure at one side of the diaphragm. The other chamber (called the low pressure chamber) has an inlet passage connected to a chlorine cylinder and an outlet passage connected through a metering device to an ejector. A pressure reduction inlet valve is located in the inlet passage to the low pressure chamber and is attached to and controlled by the diaphragm. When water passes through the ejector, a vacuum, or negative pressure is produced which is applied to the low pressure chamber of the regulator. In the absence of a vacuum, the diaphragm is biased by means of a spring to close off the inlet valve, thereby preventing the flow of chlorine into the low pressure chamber. The presence of a vacuum in the low pressure chamber, which indicates a demand for chlorine gas, overcomes the spring bias, and causes the diaphragm and the inlet valve to move and open the inlet passage to permit the chlorine gas to pass from the inlet through the low pressure chamber to the outlet passage. Wallace, et al., disclosed that their invention had an improved safety feature over prior art processes in that after the chlorine gas leaves the regulator it will be "at atmospheric or less than atmospheric pressure" (page 2, lines 74–75), and, should there be a break in the circuit, there is less danger of chlorine gas escaping into the air. Of the 6 basic components of the Haskett patent, Wallace, et al. show, and bring together, four: a vacuum operated diaphragm regulator, a metering valve, a visual indicator of chlorine flow, and a means for producing vacuum. Wallace, et al. does not disclose "cylinder mounting" the regulator, a second shut-off valve, or out-of-gas indicator means.

b. Peet, Patent No. 1,998,250 (DX 117). This patent, granted in 1932, was not cited by the Patent Office. It is presented by the patentee in this action to illustrate that preventive measures were required to eliminate the liquefaction problem. Peet states that dirt deposited by liquefied chlorine will clog small flow orifices. Peet avoids the problems caused by liquefaction "by maintaining between the liquid chlorine container and the reducing valve a supply of chlorine gas in a storage tank or reservoir at a pressure below that at which the gas will liquefy at any temperature to which it is liable to be subjected . . . ." (col. 2, lines 35–40). When the reservoir is filled from a higher pressure chlorine tank, gas is supplied at a high flow rate permitting the use of a larger orifice which is not likely to become clogged. From the reservoir gas is supplied at a low flow rate to the flow-controlling apparatus. Peet describes the operation of his invention and in particular, the flow-controlling apparatus at column 3, lines 16–33 where he states:

"The drawing shows a flow-controlling apparatus A to which chlorine gas is supplied from a cylinder 10 containing liquid chlorine, from the top of which, when the apparatus is in use, chlorine is permitted to escape as a gas through a shut-off valve 11 to flow through a tube 12, a storage tank or reservoir 13 and tube 14 to a pressure-reducing and regulating valve 15 of the control apparatus.

The flow-controlling apparatus may be of any kind suitable for reducing the pressure of gas drawn from a supply at relatively high pressure and supplying the gas for use at a desired rate. It may be a pressure supply apparatus for supplying the gas at a suitable pressure, usually only a few pounds

above atmosphere, or it may be of the type which supplies the gas at atmospheric or sub-atmospheric pressure."

c. The Victor Regulator Company sold a "cylinder mounted" positive pressure diaphragm regulator designed to handle chlorine in 1949 and since 1951 has advertised in its catalog and offered for sale in this country such "cylinder mounted" chlorine regulators. (Tr. 78, 110, 262, 265, 267, 282, 346, 367, 368, 565). These prior art references were not considered by the Patent Office. They differ from the Haskett invention in that the gas output is at a pressure above atmospheric rather than slightly below atmospheric pressure. Haskett testified that if a Victor regulator was set to reduce the pressure to 25 pounds, liquefaction would not occur until the ambient temperature dropped below 12° F. (Tr. 565). The Victor regulators incorporated a flow meter and a control valve. (Tr. 273, 274)

d. Everson, Patent No. 2,260,936 (PX 51) dated October 28, 1941, discloses apparatus for controlling the supply of chemical treatment fluid such as chlorine, and employs a pressure reducing and control valve (16) in close proximity to the chlorine cylinder. A valve fitting is provided at the outlet of Everson's chlorine tank. The high pressure gas flows directly to the pressure reducing and control valve through a pressure gauge; there is no high pressure flow through a pipe of unspecified length as there is in Wallace, et al. The limited high pressure flow of Everson meets Haskett's claimed flow path limitation (see finding 17(a)). The pressure reducing and control valve of Everson is not mounted on the valve outlet of the cylinder and the disclosure does not indicate it is a diaphragm regulator (Tr. 161, 867, 871), however, the vacuum created at the ejector is effective to maintain the entire flow control system between the ejector and the valve (16) under a slight negative pressure. Everson emphasizes the important safety objectives that are achieved when a system handling noxious gases such as

chlorine is maintained at a pressure slightly below atmospheric. As long as the pressure in the flow system is below atmospheric pressure, leakage of harmful chlorine cannot occur outwardly of the transport structure. (page 4, left col., 11. 37–51). This patent was not considered by the Patent Office.

c. Pardee, Patent No. 2,151,142 (PX 49) dated March 21, 1939, discloses apparatus for controlling the supply of chemical treatment fluid such as chlorine which includes a vacuum operated diaphragm regulator. Pardee includes three diagrammatic representations explaining the arrangement of the elements used in his flow control system. In addition he discloses, in figure 4, the essential parts of a practical embodiment incorporated in a concrete form of his invention. The chlorine cylinder is not shown in figure 4. Instead, there is a pipe of unspecified length leading from a source entitled "from gas supply". This outlet pipe is provided with a shut-off valve incorporating a pressure gauge. The vacuum operated diaphragm regulator is directly attached to the shut-off valve. The regulator is not mounted on the valve outlet of the cylinder and the flow path of high pressure chlorine is not disclosed. (Tr. 538–544, 854–866, 995–996, 1015–1016). This patent was not considered by the Patent Office.

f. Swedish Patent No. 116,969 (PX 60) dated August 6, 1946, discloses a chlorination system which employs a "cylinder mounted" positive pressure regulator (b). A control valve (c) is connected to the outlet of pressure regulator (b) to reduce the gas pressure to a few centimeters above atmospheric pressure. (Tr. 90, 150–152, 342–344, 384–385, 1,000, 1,113, 1,037). The Swedish Patent involved separate and conflicting translations (Tr. 935–939). While this reference is pertinent prior art, it is no more pertinent than the Victor references which did not involve conflicting translations.

g. Hegwein, Patent No. 2,241,101 (PX 50); Cobb, Patent No. 2,746,471

(PX 55); and Petley, Patent No. 942,-042 (PX 45) disclose a second shut-off valve in a fluid regulator that is substantially the same as the second shut-off valve in the Haskett patent. (Tr. 91–97, 348–353). While these prior art regulators incorporating a second shut-off valve do not specifically disclose using chlorine gas, the construction and principle of operation of these prior art devices are exactly the same as the claimed second shut-off valve incorporated in the Haskett regulator. Hegwein and Petley also disclose means operatively associated with the diaphragm to indicate the closing-off of the second valve. See PX 2 at 131; PX 45 at p. 1, right column, lines 20–64. Hegwein was considered by the Patent Office in rejecting claims drawn to a regulator with second valve means during the prosecution of the parent application (PX 2), but a different reference (Hughes Patent, PX 54) was used to meet this feature during prosecution of the continuation application. Cobb and Petley were not considered by the Patent Office.

h. Stenberg, Patent No. 3,010,467 (PX 57), which was filed on June 3, 1968, and is therefore prior art, discloses a chlorination system which combines a vacuum operated diaphragm regulator, a flow rate indicator, a metering valve, and an ejector in a common housing. The regulator is not "cylinder mounted". This reference was considered by the Patent Office during prosecution of the parent application. (PX 2 at 131–134).

i. Heidbrink, Patent No. 1,687,768 (PX 48); Wolf, Patent No. 1,026,066 (PX 46); and Swiss, Patent No. 97,051 (PX 59) disclose tank mounted pressure reducing regulators and conventional clamping means. (Tr. 342). These references do not disclose using chlorine. They were considered by the Patent Office during prosecution of the parent application. (PX 2 at 86, 91, 94).

34. The most pertinent prior art was not considered during the prosecution of Haskett's application before the Patent Office.

b. Differences between the Prior Art and the Claims.

35. The differences between the Haskett patent and Wallace, et al. (finding 33(a)) are that Haskett rearranged the elements of Wallace, et al., incorporated a second shut-off valve and an out-of-gas indicator, and located the regulator such that the inlet of the regulator was mounted directly to the valve outlet of the cylinder.

36. The primary difference between the Haskett patent and the Victor regulators (finding 33(c)) and the Swedish Patent (finding 33(f)), is that Haskett's diaphragm regulator is operated by a vacuum with the resulting outlet gaseous flow being at a pressure slightly below atmospheric pressure. The diaphragm in the Victor and Swedish patent references is operated by a difference in positive pressures with the resulting outlet gaseous flow being at a pressure above atmospheric. There are no differences in the principle of operation, and only a minor structural difference between pressure and vacuum type regulators. (Tr. 79,222–224, 358–360, 383). The Victor and Swedish patent regulators do not disclose a second shut-off valve or out-of-gas indicator means.

37. The Everson chlorination system (finding 33(d)) inherently meets the claimed high pressure flow path limitation, but Everson's regulator is not mounted on the valve outlet of a chlorine cylinder and it is not a vacuum operated diaphragm regulator. Everson does not disclose out-of-gas indicator means.

38. Pardee (finding 33(e)) differs from Haskett in not disclosing "cylinder mounting" or a high pressure chlorine flow path that "does not substantially exceed the radius of the cylinder".

39. Hegwein, Cobb and Petley (finding 33(g)) disclose second shut-off valves in fluid regulators, but they do not specifically disclose chlorine gas as the fluid and they are not concerned with the location of the regulator relative to the fluid source. While Hegwein and Petley disclose means to indicate a

drop off in source pressure, they do not disclose detailed indicator means.

40. The Stenberg chlorine regulator (finding 33(h)) is not "cylinder mounted".

41. The "cylinder mounted" regulators of Heidbrink, Wolf, and the Swiss patent (findings 33(i)), do not disclose using chlorine. Also, they are not vacuum operated diaphragm regulators.

c. The Level of Ordinary Skill in the Art.

■ 42. The level of ordinary skill in the art of fluid control at the time of Haskett's invention is represented by evidence showing the technical competence and experience of skilled artisans working in this area and by the manner in which problems seen by those skilled in the art were solved.

a. It is evident from the testimony of all the witnesses that the formal education of skilled artisans designing and developing fluid control devices includes at least an undergraduate degree in engineering. Those skilled in this area also generally have practical experience in designing devices for various gases and liquids, both corrosive and non-corrosive, and with the materials required for use with specific fluids. (Tr. 54, 169, 202, 326, 428, 500, 514, 782, 981, 983, 1077).

b. A problem associated with control systems used in connection with chlorine is the danger of the gas escaping into the atmosphere. Those skilled in the art readily solved this problem by employing a vacuum operated regulator. A leak downstream of a vacuum regulator will cause atmospheric pressure to be admitted which will unbalance the regulator in the direction to shut it off. (Tr. 64–66, 548–551, 782). Pressure operated regulators are still used in certain situations, however. (Tr. 802, 805, 806, 823, 824).

c. Another problem associated with control systems used in connection with chlorine is liquefaction during high pressure flow. This problem was solved primarily by employing a pressure re-

ducing valve or a heater on the high pressure pipe between the cylinder and the vacuum operated regulator which was generally wall mounted and connected to several chlorine cylinders. (Tr. 62, 801, 802, 911). After Haskett's invention this problem was solved in the same manner in high chlorine capacity installations (Tr. 796, 1023), but in low capacity installations the vacuum operated regulator was generally mounted directly on the outlet valve of the cylinder, thus eliminating the need for a pressure reducing valve, etc. Low capacity has been defined as under 100 pounds per 24 hours (Tr. 1078).

2. Secondary Considerations

43. The Haskett invention has enjoyed substantial commercial success. (PX 113). However, Capital's success in the marketplace is attributable at least in part to intensive promotional activities (810, 811, 821, 822, 913) and an increase in the need for low capacity installations (Tr. 183, 337).

44. Haskett did not succeed where others had tried and failed. The evidence indicates those skilled in the art were not particularly concerned with the problem of chlorine liquefaction. Its causes were known and it was prevented by several reliable procedures (Tr. 75, 389, 561–565, 592–597, 613, 802, 1018, 1025). There was not a long felt but unsatisfied need for Haskett's invention.

45. There were no technical reasons discouraging one of ordinary skill in the art from locating a vacuum operated regulator directly on the valve outlet of a chlorine cylinder (Tr. 792, 1023, 1042).

46. Haskett's invention was not immediately recognized by the industry as the solution to a problem (Tr. 174, 175, 410, 414, 1022, 1101). Capital introduced its "cylinder mounted" regulator in 1960, more than five years before the issuance of the patent. Until 1968, when F&P introduced a "cylinder mounted" regulator, no other company offered such "cylinder mounted" vacuum operated chlorine regulators for sale

(Tr. 177), and no competitor has taken a license under the patent (Tr. 789). Both plaintiff and defendant sell the same regulator for wall-mounting as well as "cylinder mounting" and recommend that the wall-mounted unit be used when larger capacity is required; the "cylinder mounted" regulators are not practical for such applications. (Tr. 198, 784, 1078).

### 3. *Findings of Obviousness*

47. It would have been obvious to one of ordinary skill in the art of fluid control at the time of Haskett's invention to:

a. Locate the pressure reducing and regulating apparatus of Wallace, et al. on the valve outlet of a chlorine cylinder.

b. Employ the diaphragm operated shut-off valve as shown in the regulators of Hegwein, Petley and Cobb in the diaphragm operated chlorine regulator of Wallace, et al.

c. Combine the out-of-gas indicator means operatively associated with the diaphragms of Hegwein and Petley with the diaphragm regulator of Wallace, et al.

d. Change the location of the flow rate indicator and metering valve of Wallace, et al. It would be obvious to incorporate these elements in the regulator housing especially in view of Stenberg.

e. To combine the second shut-off valve means, flow indicating means, metering means, and out-of-gas indicator means in the Wallace, et al. regulator located on the valve outlet of a chlorine cylinder. There is no cooperation between the location of the regulator and the operation of these means.

f. Employ the vacuum operated regulator of Wallace, et al. as modified with second shut-off valve means in the chlorine supply system of Everson.

g. To convert the positive pressure operated diaphragm regulators of Victor and the Swedish patent to negative pressure operated regulators and to incorporate the second shut-off means of Hegwein, Petley, and Cobb.

### B. Anticipation

48. No single prior art reference discloses a vacuum operated diaphragm regulator directly attached to the valve outlet of a supply cylinder.

### C. Recitation of Operable Structure in Claim 14

49. Claim 14 particularly points out and distinctly claims what Haskett regards as his invention. The invention is readily ascertainable from a reading of claim 14.

### IV. *Infringement*

50. Defendant, patentee, has charged plaintiff with infringement of claims 1–8, 10–15, 17 and 18.

51. The accused device, as compared with the disclosed invention, is substantially the same in construction, mode of operation, and result.

52. Defendant did not introduce evidence that plaintiff's accused device infringed claims 2–4, 6, 8, 12, 13 and 18. The record does not include evidence comparing the elements and steps recited in these claims with the elements and steps alleged to exist in the accused flow control system.

53. F&P has admitted infringement of method claims 5 and 7, and apparatus claim 14, assuming those claims to be valid. F&P has denied infringement of those claims which call for the second shut-off valve which seats about the inlet passageway of the Haskett regulator. Apparatus claims 10, 11, 15, and 17 call for a second valve means to seat about said inlet passageway.

54. Method claims 1, 5 and 7 describe the operation of the second valve in terms of closing off chlorine flow when the positive pressure is lowered. The accused flow control method falls clearly within these claims.

55. Apparatus claim 14 does not recite second valve means. The accused apparatus falls clearly within this claim.

56. The second shut-off valve in the accused device is seated about the outlet

passageway of the regulator. In claims 10, 11, 15 and 17 of the Haskett patent the second shut-off valve is seated about the inlet passageway.

57. The function of the second valve in the accused device is substantially the same as that of the second valve claimed in the Haskett patent, namely, to stop the flow of chlorine gas through the regulator when an increased vacuum is present. The result is a regulated chlorine flow and, upon exhaustion of chlorine, elimination of the possibility of back up water getting into the chlorine cylinder where it could cause serious trouble. Because of its slight change in location, the accused second valve additionally prevents the increased vacuum and any reverse flow of water from doing possible harm to the diaphragm chamber.

58. The accused and claimed valve operate in the same manner. Both valves seat upon the movement of the diaphragm in response to increased vacuum. In both valves the seat is formed between the diaphragm and the surface of the regulator housing.

59. The accused valve performs substantially the same function in substantially the same way to obtain the same result. The accused valve is equivalent to the claimed valve.

### V. *Ownership*

60. In June 1952, defendant Haskett executed an agreement with plaintiff in which he agreed to assign all inventions "conceived or made" by him during his employment with plaintiff (PX–73).

61. Haskett's employment with F&P terminated in March 1959. Haskett formed defendant Capital in January 1960.

62. Haskett was the sole inventor of the patent in suit. He conceived of "cylinder mounting" a chlorine regulator on December 15, 1959; and while unemployed and acting alone, he made sketches of the device, made some of the parts of the first prototype himself, and in reducing his invention to practice, he received no assistance from any employee of F&P, other than the machine work performed by David Hardy during Hardy's off-duty time.

63. On November 16, 1966, Haskett assigned U. S. Patent No. 3,220,430 to Capital Controls Co., Inc. (DX 114).

64. F&P became aware of the Haskett patent application in April 1960. Since the application was maintained in secrecy by the Patent Office, F&P did not know what Haskett was claiming as his invention. F & P did not believe that tank-mounting of the chlorine regulator was being claimed (Tr. 179). F&P first became aware of the patent in January 1966 (Tr. 178), shortly after the patent issued, and thereafter decided to add a tank-mounted chlorine regulator to its line of wall and panel-mounted chlorine regulators (Tr. 176).

65. Shortly after making its decision to manufacture a tank-mounted chlorine regulator, plaintiff requested Haskett to assign the patent to plaintiff. Upon Haskett's refusal to do so, plaintiff promptly brought this action (Tr. 182). Plaintiff is not barred by laches or otherwise estopped from making its claim to ownership of the patent, nor has plaintiff at any time waived its claim to ownership of the patent.

### DISCUSSION

#### I *Validity*

Congress provided in 35 U.S.C. § 282 that:

> "A patent shall be presumed valid. Each claim of a patent . . . shall be presumed valid independently of the validity of other claims; . . . . The burden of establishing invalidity of a patent or any claim thereof shall rest upon the party asserting it."

This presumption of validity is weakened or overcome however, in cases such as this where pertinent prior art is not considered by the Patent Office. Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics In-

dustries, Inc., 450 F.2d 1164 (3d Cir. 1971).

## II *Obviousness*

The considerations in determining obviousness as enunciated by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17, 18, 86 S.Ct. 684, 694, 15 L. Ed.2d 545 (1966) are:

"Under [35 U.S.C.] § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness"; a Nontechnical Approach to Patent Validity, 112 U. Pa.L.Rev. 1169 (1964)."

The "scope and content" of the prior art consists of prior patents, publications, products, and methods in use at the time the invention was made, whether or not the inventor was actually aware of such prior art when he made the alleged invention. The pertinent prior art is that to which one can reasonably be expected to look for solutions to the problems which the patented device attempts to solve.

The differences between the subject matter patented in claims 1–8, 10–15, 17 and 18 and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art of fluid control. The secondary factors (findings 43–46) were considered, but they did not tip the scales in favor of patentability.

Before Haskett's invention it was known that under certain conditions liquefaction would occur during high pressure flow of chlorine. The problem was not considered to be serious; its causes were known and it was solved, when necessary, by simple effective means. (Tr. 75, 389, 561–565, 592–597, 613, 802, 1018, 1025). One conventional solution was the installation of a pressure reducing valve on the high pressure line. This eliminated liquefaction downstream of the pressure reducing means. (Tr. 597–598). The skilled artisan designing a particular chlorine flow control installation at the time of Haskett's invention would be expected to consider several factors in deciding where to locate his chlorine regulator. To prevent liquefaction he would consider conventional pressure reducing or heating means including the Victor regulator. This "cylinder mounted" regulator regulated chlorine flow while reducing the pressure which prevented liquefaction. (Tr. 565). The inlet of a typical regulator is the pressure reducing valve. To the extent safety was an important consideration, the skilled artisan would be expected to eliminate as much high pressure flow as possible to reduce the possibility of leakage of noxious chlorine into the atmosphere. See finding 33(d). He would also consider employing a vacuum operated regulator rather than a pressure operated regulator for safety reasons. (Tr. 59, 63–65, 330, 331). The amount of chlorine needed per day, convenience, and a requirement to adhere to a particular specification of the user are other factors which would influence the artisan's decision. (Tr. 60, 76, 174, 175, 333, 336, 796, 909, 910, 1023). There were no known technical reasons to discourage "cylinder mounting" the regulator of Wallace, et al. (792, 1023, 1042). The decision to use a vacuum operated or pressure operated regulator and whether to locate it on, near, or at a distance from the chlorine cylinder(s) was merely a matter of routine engineering choice within the purview of one reason-

ably skilled in the art at the time of Haskett's invention.

Capital agrees that the construction and principle of operation of the regulators shown in Cobb, Hegwein, and Petley are exactly the same as that claimed by Haskett, but contends that plaintiff has not shown any prior art which suggests the combination of a second shut-off valve such as the Hegwein valve with a diaphragm operated regulator for use in a chlorination system. Capital has taken an unduly restricted view of the prior art. The shut-off problem confronting Haskett was not peculiar to chlorine, it was a fluid control problem. The relevant prior art is that to which one can reasonably be expected to look for a solution to the problem which the patented device attempts to solve. Burgess Cellulose Co. v. Wood Flong Corp., 431 F.2d 505 (2d Cir. 1970). The patent in Calmar, Inc. v. Cook Chemical Co., decided along with *Graham*, related to an insecticide sprayer. The Supreme Court found that closure devices for liquid containers were also "at the very least" pertinent references. It would have been obvious to one of ordinary skill in the fluid control art at the time of Haskett's invention to combine the second shut-off valve means disclosed in Hegwein, Petley and Cobb with the chlorine regulator of Wallace, et al.

The combination of such conventional elements as shut-off valve means, flow indicating means, metering means, and broad out-of-gas indicator means in the vacuum operated regulator housing where they perform no new or different function would, of course, be obvious. It would also be obvious to include some or all of these means, as desired by the skilled artisan, in a "cylinder mounted" chlorine regulator. There is no cooperation between the location of the regulator and the operation of these means. Each of these elements performs in the same manner regardless of where the regulator is located.

Everson and Wallace, et al. disclose similar prior art chlorine supply systems. While there is disagreement as to whether the pressure reducing and control valve (16) of Everson is a vacuum operated diaphragm regulator like that disclosed by Wallace, et al. (Tr. 88, 161, 342, 343, 544–547, 866–867), it is clear that both Everson and Wallace, et al. teach maintaining their flow control systems under vacuum. It would be obvious for the skilled artisan to substitute the conventional Wallace, et al. chlorine regulator with its inherent safety shut-off feature (Tr. 64–66, 330, 331) for the control valve (16) in Everson's chlorine supply system. For reasons discussed earlier it would also be obvious to incorporate second shut-off valve means in the combination. As discussed in finding 33(d), the limited flow path of Everson meets the claimed flow path limitation, and the obvious substitution of the Wallace, et al. regulator incorporating second shut-off valve means meets method claims 1–7.

It would also have been obvious for one of ordinary skill in the art to convert the positive pressure operated regulators of Victor and the Swiss patent to negative pressure regulators. While there is no difference in principle of operation, and only a minor structural difference between pressure and vacuum type regulators (Tr. 65, 66, 79, 222–224, 358–60, 383), the question is not how easy it would be to make the change, but rather, whether it would be obvious to make the change. The record indicates that positive pressure regulators such as Victor do have some use in conjunction with chlorine gas (Tr. 802, 805, 806, 823, 824), but that vacuum operated regulators are preferred when using this gas because of their inherent safety advantages (Tr. 64–66, 330–331, 548–551, 782). It would be obvious for the skilled artisan designing a chlorine installation where safety was an important consideration to merely reverse the bias of the Victor inlet valve spring and achieve a vacuum regulator. In addition, the Peet Patent (finding 33(b) ) in describing flow controlling apparatus

(A) indicates that either vacuum or pressure type apparatus may be employed in a chlorine flow control system.

### III *Anticipation*

 F&P citing Package Devices v. Sun Ray Drug Co., 432 F.2d 272 (3d Cir. 1970), contends that the sale of a Victor regulator in 1949 bars the patentability of Haskett's invention under 35 U.S.C. § 102(b). *Package Devices,* which stated that the obviousness test of Section 103 was implicitly contained in Section 102(b), was concerned with a factual situation where references came into existence after the date of the applicant's invention but more than one year before the date of application for patent in the United States. Invalidity, therefore, could not be bottomed on 35 U.S.C. § 103 which determines patentability by employing an obviousness test at the time the invention was made. In the present action all prior art references were in existence at the time of Haskett's invention, and it is proper for the Court to determine patentability by employing the obviousness test of Section 103.

### IV *Infringement*

An invalid claim, of course, may not be infringed. The Court has included findings on this issue, however, in the interest of avoiding delay should the decision on validity be reversed on appeal.

The infringement issue is governed by Graver Tank & Mfg. Co. v. Linde Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, where the Court stated:

> "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." (p. 607, 70 S. Ct. at p. 855)

Thus, claims 1, 5, 7 and 14 of the Haskett patent are infringed. See findings 54 and 55.

 While claims 10, 11, 15 and 16 do not read literally on the accused device, the courts have recognized that:

> ". . . [T]o permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy." [2]

> "The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice fraud on a patent. . . . 'To . . . prevent an infringer from stealing the benefit of the invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.'" [3]

The Court has determined that the second shut-off valve in the accused F&P device is equivalent to the claimed second shut-off valve (finding 59). Claims 10, 11, 15, and 17 of the Haskett patent are also infringed, because the change which avoids literal infringement comes within the doctrine of equivalents.

### V *Ownership*

 Plaintiff contends that Haskett conceived of the cylinder mounting aspect of his invention while an employee at F&P under a contractual obligation to assign all inventions "conceived or made" by him during the period of his

---

2. 339 U.S. at 607, 70 S.Ct. at 856.

3. Id. at 608, 70 S.Ct. at 856.

employment. F&P further contends that after Haskett's departure from the company other F&P employees completed the design and construction of Haskett's patented invention.

The weight of credible evidence produced at trial establishes that Haskett conceived of his invention after leaving F&P, and that the only assistance he received from any F&P employee was machine work performed during the employee's off-duty time.

It should be noted that while plaintiff's second contention challenges the validity of the Haskett patent for failure to join a true inventor, plaintiff did not introduce the clear and convincing evidence necessary to rebut the presumption that Haskett is the inventor. Porter-Cable Machine Co. v. Black & Decker Mfg. Co., 274 F.Supp. 905 (D. Md.1967), aff'd. 402 F.2d 517 (4th Cir. 1968), cert. denied, 393 U.S. 1063, 89 S. Ct. 716, 21 L.Ed.2d 706 (1969).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this suit, and over the parties.

2. Dart Industries is the rightful owner of all right, title and interest in and to Patent No. 3,220,430.

3. Haskett is the sole inventor of the claimed subject matter.

4. The most pertinent prior art was not considered by the Patent Office in granting the patent; the presumption of patent validity, therefore, under 35 U.S. C. § 282, is destroyed.

5. Claims 9, 16 and 19 remain valid.

6. Claim 14 meets the requirements of 35 U.S.C. § 112.'

7. Claims 1–8, 10–15, 17 and 18 are invalid and, therefore, not infringed. The subject matter of these claims is obvious under 35 U.S.C. § 103.

8. Claims 1, 5, 7, 10, 11, 14, 15 and 17, if valid, are infringed.