**MOORE BUSINESS FORMS, INC.,**
**Plaintiff,**

**v.**

**MINNESOTA MINING AND MANUFAC-**
**TURING COMPANY, Defendant.**

**Civ. No. 1972–47.**

United States District Court,
W. D. New York.

July 2, 1974.

Watson, Cole, Grindle & Watson, Washington, D. C. (Walter D. Ames and James H. Marsh, Jr., Washington, D. C., of counsel), and Cohen, Swados, Wright, Hanifin & Bradford, Buffalo, N. Y. (Thomas J. Hanifin, Jr. and David T. M. Murphy, Buffalo, N. Y., of counsel), for plaintiff.

Alexander, Sell, Steldt & DeLaHunt St. Paul, Minn. (Edward A. Haight, Chicago, Ill., Stanley G. DeLaHunt and Gary L. Griswold, St. Paul, Minn., of counsel), and Raichle, Banning, Weiss & Halpern, Buffalo, N. Y. (Ralph L. Halpern, Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

Presently pending before the court is defendant's motion for summary judgment. Also pending are a number of motions by plaintiff to compel answers to interrogatories and a motion by defendant to stay discovery pending this court's decision on the motion for summary judgment. When the court first heard oral argument on these motions on August 2, 1973, the plaintiff represented that it could not answer defendant's motion for summary judgment because more discovery was needed. Since plaintiff had three motions to compel discovery pending, none of which had been answered by defendant, the court directed defendant to answer, brief the issues of law and return again for reargument.

On November 15, 1973 the parties returned and the court heard oral argument on the summary judgment motion and on the discovery motions. After counsel and the court discussed plaintiff's interrogatories and defendant's objections, the plaintiff agreed that many of its interrogatories were too broad and should be rephrased. Counsel for the defendant agreed that if the interrogatories were rephrased and narrowed, he would make a new attempt to provide plaintiff with the requested information. Because plaintiff argued that it could not answer defendant's motion for summary judgment without further discovery, the court withheld ruling on that motion to give plaintiff an opportunity to narrow its interrogatories and to proceed with discovery. At that time, counsel for plaintiff promised to file the modified interrogatories within one week.

On February 26, 1974 plaintiff filed a motion entitled "Motion to Dismiss Pending Motion for Summary Judgment" with affidavits of Robert E. Burns, a patent attorney, and William D. Swiercz, a research chemist with Moore Business Forms, attached. Plaintiff requested an argument because its discovery had "virtually ceased since the bringing of the motion for summary judgment by defendant on July 2, 1973 . . . ." When the court heard argument on plaintiff's motion on March 11, 1974, it was difficult to determine plaintiff's position. Although plaintiff previously represented to the court that it could not answer defendant's motion for summary judgment without further discovery, and, on November 15, 1973, had agreed to narrow its interrogatories, plaintiff had not prepared the rephrased interrogatories. In fact, plaintiff had not attempted to secure any additional discovery between the court appearance of November 15, 1973 and that of March 11, 1974.

Considering this background, it appeared that plaintiff agreed that the motion for summary judgment was ripe for decision. However, to be certain that this was the case, at the March 11 argument the court asked plaintiff if it had submitted all it intended to submit in opposition to defendant's motion for summary judgment. Plaintiff responded that it might want to take the deposition of the patent examiner to

explain the history and meaning of the Macaulay patent and agreed that by March 25, 1974 it would take one of three courses of action: First, to depose the patent examiner; secondly, to file additional affidavits in response to the motion for summary judgment, or thirdly, to stand on what had already been submitted. Instead of taking any one of these three steps, however, plaintiff, on March 19, 1974, noticed and took the deposition of James Custer, manager of the Nekoosa, Wisconsin plant of defendant. Plaintiff also filed additional interrogatories, a motion to compel production of certain manuals identified during the deposition of James Custer, a request for further answers to previously filed interrogatories and three briefs. On April 8, 1974 the court heard final arguments on defendant's motion for summary judgment.

Plaintiff's complaint alleges that defendant infringes its patent entitled "Recording Paper Coated with Microscopic Capsules of Coloring Material, Capsules and Method of Making" [Patent No. 3,016,308 issued on January 9, 1962, hereinafter the Macaulay Patent]. Defendant has denied infringement and challenges the validity and enforceability of the Macaulay patent. The court here notes that defendant has been producing carbonless paper by the process alleged here to infringe since 1962 and, over the years, has sold enormous quantities of that material to plaintiff. No legal action was taken by plaintiff until January of 1972, when this suit was filed.

Defendant's motion for summary judgment is based upon defendant's allegation that the Macaulay patent refers only to a process of producing microcapsules as a substantially dry, free-flowing powder, while the microcapsules produced for defendant's Type 200 paper, the product alleged to infringe, are produced and at all times handled in aqueous slurry form. This motion is concerned only with the Type 200 paper. Defendant states that at no time can its microcapsules be characterized as a free-flowing powder, and further contends that file wrapper estoppel precludes plaintiff from now arguing that producing microcapsules as a free-flowing powder is equivalent to producing them in aqueous slurry.

In support of the motion, defendant filed an affidavit of Dr. Dean A. Ostlie, Research Manager in defendant's paper products division, and an affidavit of Stanley G. DeLaHunt, counsel for defendant. Attached to these affidavits are copies of depositions, including those of Dr. Ostlie and Dr. Macaulay, copies of patents belonging to defendant, copies of answers to interrogatories, and a copy of the proceedings in the United States Patent Office upon which the Macaulay patent was granted [hereinafter file wrapper]. In opposition to that motion, plaintiff has submitted an affidavit of William D. Swiercz, Research Chemist in the Process Engineering Group of the Research Department of Moore Business Forms, Inc., and an affidavit of Robert E. Burns, a patent attorney.

The affidavit of Dr. Ostlie, dated June 29, 1973, states that defendant Minnesota Mining and Manufacturing Company manufactures and markets carbonless paper products designated as carbonless paper, Type 100, and carbonless paper, Type 200. In the case of the Type 200 paper, microscopic capsules containing an imaging fluid are coated on the surface of the paper. In the case of carbonless paper Type 100, microscopic capsules containing imaging fluid are combined within the paper itself. With each type of paper, when the sheets are impacted by a writing instrument the microscopic capsules are ruptured in the impacted areas, releasing the fluid, which reacts with other components to form an image in the impacted area. Because the capsules in Type 100 paper containing the imaging fluid combine with the other component to form an image within the paper matrix itself, the Type 100 paper

does not need the presence of another sheet or companion structure to form an image.

However, with carbonless paper Type 200, two or more sheets are needed to create the image because the microcapsules in the Type 200 paper containing the imaging fluid are coated on the back of a sheet and the component with which the fluid reacts on release, through impacting of the capsules, is contained on the front surface of the underlying sheet. When the two sheets are together and impact occurs, an image is formed on the underlying sheet. The capsule layer in the Type 200 paper contains, in addition to the imaging microcapsules, a small quantity of relatively larger scuff microcapsules which serve as spacers to minimize contact between adjoining sheets in the Type 200 system, in order to avoid premature or inadvertent images.

Only three types of microcapsules are employed by defendant in the manufacture of carbonless paper. These are the imaging capsules employed in the Type 100 carbonless paper, the imaging capsules employed in the Type 200 paper and the larger scuff capsules employed in the Type 200 paper. All the microcapsules employed in defendant's commercial carbonless papers are formed in aqueous slurry, which slurry is of a pumpable consistency and contains more than one-half water. "While over the years there have been some slight changes in ingredients, amounts of ingredients and process conditions, at no time since the inception of 3M's carbonless paper products have these differences led to the formation of microcapsules other than in an aqueous slurry of pumpable consistency containing more than one-half water." (Ostlie affidavit of June 29, 1973, at 4.)

In the manufacture of the Type 200 carbonless paper, the aqueous slurry of imaging capsules is dumped into a tank and blended with the aqueous slurry of scuff capsules and this solution is then coated onto the paper. The Type 100 paper is made by mixing the aqueous slurry of capsules into the paper-making machine, blending it with the paper fibers and other ingredients. In any transportation or other steps taken in the manufacture prior to the final product formation, the microcapsules are handled as a slurry, always containing more than one-half water. This has been true since the beginning of 3M's manufacture of all its commercial carbonless papers. At no point from the formation of microcapsules to the production and packaging of the carbonless paper products can the microcapsules employed in any carbonless paper product of defendant be characterized as a "free flowing powder."

In response to the affidavit of Dr. Ostlie, plaintiff has provided the affidavit of William D. Swiercz, a Research Chemist in the Process Engineering Group of the Research Department of Moore Business Forms, Inc. The Swiercz affidavit documents two experiments, both of which vary the conditions of Example 4 of the Macaulay patent found in column 9, lines 19 through 45. Through these experiments Swiercz attempts to show that the microcapsules he produces in the form of an aqueous solution and the microcapsules he produces in the form of a powder are equivalent. The Swiercz affidavit does not attempt to show equivalency with respect to the microscapsules alleged to be here infringing. No tests have been conducted on any of the alleged infringing carbonless papers. The affidavit of Mr. Burns contains his opinion that there is no file wrapper estoppel which precludes or restricts application of the doctrine of equivalence in considering infringement of patent claims by the defendant. The court considers this affidavit as legal argument only.

■ The court is aware of the caution usually exercised in granting a motion for summary judgment in patent cases. When, however, there are no material fact issues, and when expert testimony is not needed to explain the prior art and the patent claims, summary judgment has been found to be appropriate.

*See* Vermont Structural Slate Co. v. Tatko Bros. Slate Co., 233 F.2d 9 (2d Cir. 1956).

Moore's Macaulay patent "relates to a novel product comprising a substantially dry free-flowing powder of microscopic discrete capsules, to the process of producing said product, and to a pressure-sensitive record or copying material having a transfer coating of said microscopic discrete capsules on at least a portion of one surface thereof." (Macaulay patent, column 1, lines 1 through 6.) The written description of the Macaulay patent continues by distinguishing the process of Macaulay from the work described in a "Green" patent (United States Patent No. 2,712,507, issued on July 5, 1955).

The Green patent describes a process for making microcapsules in an aqueous system. In that aqueous system the material that forms the walls of the microcapsules is the same as that of the coatings on the paper into which the marking fluid is dispersed. The Macaulay patent states that the use of aqueous coating systems is a serious disadvantage because it requires that special grades of generally more expensive paper be used and, even with the special grades of paper, often buckling, distortion and warping result. Additionally, aqueous coatings are generally not suitable for application to limited areas of one side of a sheet of paper. Generally, they are suitable only for application to the entire side of a sheet of paper.

The description of the Macaulay patent states that it is the object of the Macaulay patent to provide a process for producing substantially dry, free-flowing powder of microscopic discrete capsules of marking fluid which may be applied to paper. It is also an object of the Macaulay patent to apply these microscopic capsules by means of a carrier or binder which is of a different material from that of the walls of the capsules. The obvious thrust of the description of the Macaulay patent is to distinguish the process described

in the Macaulay patent from the prior art as described in the Green patent. In the Green patent, microscopic capsules must be produced in an aqueous solution. In order to eliminate some of the disadvantages of producing microcapsules in an aqueous solution, the Macaulay patent describes the process of producing microcapsules by spray-drying the component materials. While in the Green patent the walls of the capsule are produced in the aqueous solution, in the Macaulay patent the walls are produced when the component chemical materials are spray-dried. In the Macaulay patent it is explained that once the capsules are produced as a dry, free-flowing powder they may be washed with a solvent, air dried again and stored for use. By looking at the claims of the Malcaulay patent, there can be no doubt that it is essential to the Macaulay process of producing microscopic capsules that they be produced by drying the component materials into a free-flowing powder. Each of the claims of the Macaulay patent calls for or depends upon a free-flowing powder of microscopic capsules. The claims that defendant is charged to infringe, claims 8, 11, 12, 13, 16, 17, 22, 23, 24, 25, 26, 27, 28 and 29 are all either directed to or defined by a process for producing a free-flowing powder. No claim of the Macaulay patent includes microscopic capsules formed in an aqueous system.

■■ Plaintiff argues that the process defendant uses to produce microcapsules in aqueous slurry is equivalent to the process of producing dry microcapsules as described in the Macaulay patent. The doctrine of equivalence states that there is direct infringement of a patent claim if the accused device performs substantially the same function in substantially the same way to obtain the same result. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929). *See also* Graver Tank and Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Generally, equivalence is a

question of fact. However, no genuine issue of fact is presented if it appears from the patent claims, specifications, drawings and file wrapper that extrinsic evidence in the form of testimony from those persons ordinarily skilled in the pertinent art is not needed to explain terms of art or for evaluation of prior art, or the resolved questions of the application of descriptions to the accused subject matter. Thus, if equivalency can be determined by a comparison of the accused device and the patent claims, equivalency is a matter of law for the court. *See* Sanitary Refrigerator Co., *supra*, 280 U.S. at 36, 50 S.Ct. 9; Duplan Corp. v. Deering Milliken, Inc., 370 F.Supp. 769 (D.S.C., 1973).

■ Defendant argues that plaintiff is estopped from asserting equivalency because of the doctrine of file wrapper estoppel. The doctrine states that if a patent applicant, after being refused a patent, amends his application to narrow the scope of his claims in order to obtain a patent, he cannot later charge direct infringement against a device which falls within the scope of the disclaimed or abandoned subject matter. *See* Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736 (1942).

The patent here in suit was issued on January 9, 1962. Prior to the grant of said patent, the application had been rejected by the examiner on three separate occasions, namely, on November 12, 1957, on December 10, 1958 and on March 3, 1968. The first rejection by the patent office on November 12, 1957 stated that the claims presented to the examiner were unpatentable over a number of prior United States patents. Particularly noted were the Green patents 1, 2 and 3, granted on July 5, 1955 (No. 2,712,507), July 23, 1957 (No. 2,800,457), and July 23, 1957 (No. 2,-800,458). As previously discussed, the Green patent referred to a process of

manufacturing microcapsules in an aqueous solution. In rejecting the Macaulay application, the patent examiner reasoned that the Green patents related to methods of producing free-flowing powders of the type claimed in the Macaulay application. The examiner stated that in the Green process the capsules may be formed in free-flowing form by spray-drying them.

In Macaulay's first revision of his patent application, submitted on June 9, 1958, the thrust of his amendment was to distinguish the Macaulay process of producing dry capsules from the Green process of producing capsules in an aqueous solution. In Macaulay's first amendment he states:

> When Green spray dries his dispersion he is only drying a product which already contains previously formed existing microscopic capsules. Thus, Green's spray drying constitutes merely removal of the water from the dispersion. Thus, in substance, the applicant employs *evaporation forces*, for example, in a spray drier, to form the encapsulating shell and dry powder of his microscopic capsules. Green does not use a spray drier or evaporation to form a shell, since his shell and the capsules have already been formed in the aqueous dispersion.

> (Exhibit G at 51, appended to defendant's motion for summary judgment filed July 6, 1973).[1]

The explanation of the revision of Claim 22 explains the difference in the applicant's process of producing microcapsules in dry form from Green's process of producing microcapsules in aqueous dispersion. It states:

> The claim next defines the particularly unique feature of the applicant's invention which constitutes forming the shell directly by evaporation forces on the solvent of a film-former solution which comprises the continuous phase of suspended minute particles of an emulsion, the discontinuous phase of

1. All references to the file wrapper are references to Exhibit G of plaintiff's motion for summary judgment filed July 6, 1973.

which emulsion comprises the liquid droplets. This claim clearly distinguishes over the Green patents which teach a product in which spray drying is employed only to dry the aqueous phase of a dispersion which contains previously existing capsules.

(File wrapper at 52.)

Similarly, the explanation of the revised Claim 11 on page 54 of the file wrapper states that Claim 11 was "amended to specify that the evaporation is achieved by use of a spray drier (not merely drying a *dispersion of previously formed capsules* as in the Green patents)."

When this amended application was rejected on December 10, 1958, the patent examiner gave as a reason Macaulay's failure to distinguish his process of producing free-flowing powders from the Green process of producing microcapsules in aqueous dispersions.

On June 4, 1959, Macaulay again revised his application. Quoting from the written explanation contained in the revised application:

Reconsideration is respectfully requested of the rejection of Claims 14–20 as being unpatentable over Green (2). These claims have now been amended to refer back to new capsule Claim 36, which defines the capsules in terms of structure as suggested by the Examiner. The applicant recognizes that he is not the first to apply a marking capsule to a copying sheet, but he *is* the first one to provide a copying sheet having his unique microscopic discrete rupturable capsules affixed to it. The resulting copy sheets possess significant advantages over the sheets of the Green patent. The Green patent requires the preparation of capsules in the form of aqueous dispersions and it is this aqueous dispersion which the patentee applies to the paper. This technique possesses many disadvantages, including the tendency of water to corrugate the paper and cause it to buckle and warp, even though special-

ly prepared expensive paper is employed. The applicant's capsules on the other hand, are obtained as a free-flowing dry powder and can be applied in a number of binders which are not aqueous and, therefore, do not buckle, warp, or corrugate the paper. This is much more than an obvious expedient as suggested by the Examiner. The use of a non-aqueous binder is just not feasible with the teachings of the Green patent, yet in the case of applicant's invention it is not only feasible, but preferred.

(File wrapper at 74–75.)

The application continues:

The Green patent is concerned with the process involving "coacervation" along with gellation treatment whereby he forms an aqueous dispersion of substantially completely formed capsules. When Green spray-dries this aqueous dispersion, he is drying and removing only the dispersing water. Thus in Green's spray-drying, only the water of dispersion is removed. On the other hand, when the applicant employs evaporation forces as provided by a spray-drier, he is forming both the encapsulating shell and the dry powder of his microscopic capsules at the same time.

(File wrapper at 75.)

This second amendment and third application was again rejected by the patent examiner, citing the Green patent, as being a non-patentable variation over the previous art. Since this rejection was made final, Macaulay appealed the Examiner's action to the Board of Appeals of the United States Patent Office. In his appeal the applicant repeated the arguments made before the patent examiner, attempting to distinguish his process of producing substantially dry microcapsules from the previous art. Quoting from his brief:

In the Green process, the capsules are already formed and the shells hardened by the combined "coacervation" and gellation treatment to form an aqueous dispersion of *formed* capsules.

When Green spray dries this dispersion he is only drying a product which already contains previously formed existing microscopic capsules. Thus, Green's spray drying constitutes merely removal of the water from the dispersion. Thus, in substance, the appellant employs *evaporation forces*, for example, in a spray drier, to form the encapsulating shell and dry powder of his microscopic capsules. Green does not use a spray drier or evaporation to form a shell, since his shell and the capsules have already been formed in the aqueous dispersion.

(File wrapper at 97.)

■■ Macaulay was granted patent protection on this appeal. The court finds, on the basis of the information contained in the file wrapper, that the entire thrust of the patent applicant's two revisions was to distinguish his process of producing microcapsules as a free-flowing powder from the process of producing microcapsules in aqueous dispersions. The conclusion seems inescapable that the patent office granted the Macaulay patent with the limitation that the process patented was the process of producing microcapsules by spray-drying. It is clear from the proceedings before the patent examiner that the applicant intended to distinguish the process by which the shell wall is produced by drying from the process of producing the shell wall in aqueous dispersion. The affidavit of Dean A. Ostlie previously referred to, which explains that defendant forms its microcapsules in an aqueous slurry and keeps them in that form throughout production, is uncontroverted by plaintiff. The affidavits and exhibits produced by plaintiff, including the affidavit of William D. Swiercz, fail to bring any facts to bear upon defendant's motion.

The court finds that plaintiff is precluded, because of file wrapper estoppel, from attempting to show as it does in the Swiercz affidavit that producing microcapsules in aqueous dispersions is equivalent to producing microcapsules as a free-flowing powder. The court concludes that the Swiercz affidavit presents no genuine issue of fact on the question of defendant's Type 200 brand carbonless paper infringing the Macaulay patent in suit. Defendant's motion for summary judgment on the grounds that its manufacture, use and sale of its 3M brand carbonless, paper, Type 200, does not infringe the Macaulay patent in suit is granted.

So ordered.