MOORE BUSINESS FORMS, INC.,
Plaintiff-Appellant,

v.

MINNESOTA MINING AND MANU-
FACTURING COMPANY,
Defendant-Appellee.

No. 738, Docket 74–2413.

United States Court of Appeals,
Second Circuit.

Argued April 24, 1975.

Decided Aug. 4, 1975.

Walter D. Ames, Washington, D. C. (James H. Marsh, Jr., Gary M. Hoffman, Washington, D. C., Thomas J. Hanifin, Jr., David T. M. Murphy, Niagara Falls, N. Y., and John E. Howells, Washington, D. C.), for plaintiff-appellant.

Edward A. Haight, Chicago, Ill. (Haight, Hofeldt, Davis & Jambor, Chicago, Ill., Raichle, Banning, Weiss & Halpern, Frank G. Raichle, and Ralph L. Halpern, Buffalo, N. Y., Alexander, Sell, Steldt & DeLaHunt, Stanley G. DeLaHunt, Gary L. Griswold, and G. Brian Pingel, St. Paul, Minn., on the brief), for defendant-appellee.

Before LUMBARD, HAYS and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiff, Moore Business Forms, Inc. (Moore) appeals from an order of the district court for the Western District, John T. Curtin, Chief Judge, granting summary judgment in favor of defendant Minnesota Mining and Manufacturing Company (3M) in this action for patent infringement. We reverse and remand for further proceedings.

## I. Background.

Moore is the assignee of United States Patent No. 3,016,308 (the Macaulay patent), issued January 9, 1962. The patent relates primarily to processes for producing discrete, rupturable microscopic capsules containing droplets of marking fluid and to a pressure-sensitive copying paper produced by applying a coating of such capsules to part or all of one side of a sheet of paper. Such paper is used by placing the coated side face-down, in contact with the sheet of paper on which a copy is to be made. The pressure from a writing instrument marking the top sheet ruptures a number of the capsules affixed to the back of the original.

Marking fluid is released onto the second sheet, and this results in a mark being made on the copy corresponding to that on the original. The marking fluid may be colored, or it may be a colorless chemical which will react with a chemical coated on the face of the copy sheet to produce a colored mark. In either case, this specially treated paper enables one to make copies without using a separate sheet of carbon paper. In addition, the paper is allegedly not as messy as carbon paper, because the marking fluid may be colorless and may be applied in capsules, rather than as a film which may rub off and dry out more easily.

Moore alleged in its complaint that fourteen of the twenty-nine claims in the Macaulay patent are infringed by defendant 3M's "Type 200"-brand carbonless copying paper and the process by which 3M produces it. Of the ten process claims (claims 1–10) in the Macaulay patent, only one is asserted here, claim 8. This claim, set forth in the margin,[1] describes a process for producing a free-flowing powder of discrete, rupturable microcapsules containing marking fluid, by means of a chemical condensation reaction. As we understand it, the process (in one variation) involves adding hydrochloric acid to an emulsion, wherein the discontinuous phase consists of microscopic droplets of marking fluid and the continuous phase is an aqueous solution in which several chemicals are dissolved.

Upon agitation, the hydrochloric acid reacts with the previously dissolved chemicals to form ureaformaldehyde polymers. These polymers are insoluble in water and they condense around the droplets of marking fluid suspended in the emulsion, forming microcapsules in which the polymers comprise the shell wall. The mixture is then filtered and dried, leaving a free-flowing powder of microcapsules.

The remaining claims of the Macaulay patent alleged to be infringed (claims 11–13, 16, 17, and 22–29) are "product" claims. Claims 11 through 22 are directed towards free-flowing powders of rupturable microcapsules. Of this latter group, claim 11 is representative and set forth in the margin.[2] It should be noted that claim 11, to which all the other product claims make reference, either directly or indirectly, covers a "free-flowing powder of microscopic discrete rupturable capsules" with various specifications, including one that the shell wall be made of a material which is either non-ionizable and water-soluble, or hydrophobic and water-insoluble. The remaining free-flowing powder claims are variations on claim 11. Claim 16, for example, relates to capsules "as defined by claim 11 wherein the shell material is a hydrophobic water-insoluble film-former comprising a chemical condensation polymer."

Finally, claims 23 to 29 of the Macaulay patent are directed toward recording

1. 8. A process for producing a free-flowing powder of microscopic discrete rupturable capsules comprising liquid droplets encapsulated within an outer rupturable shell of film-forming material, said encapsulating outer shell consisting of a hydrophobic water-insoluble material produced by the chemical condensation of the reactive constituents of the film-former dissolved in aqueous solution, said solution comprising the continuous phase of an emulsion, the discontinuous phase of which emulsion comprises liquid droplets comprising between about 23% and 80% by weight of the capsules, which process comprises producing an emulsion of the liquid droplets in said aqueous solution of film-former constituents, causing said film-former constituents to undergo chemical condensation about the liquid droplets, and thereby produce said microscopic discrete rupturable capsules in the form of a free-flowing powder.

2. 11. A free-flowing powder of microscopic discrete rupturable capsules having a particle size of between about 0.1 and 70 microns diameter, said capsules comprising liquid droplets encapsulated within an outer shell rupturable under pressure, said liquid droplets being substantially insoluble in and incapable of dissolving said outer shell and comprising between about 23% and 80% by weight of said capsules, said outer shell having a thickness comprising from about one-tenth to one-third of the capsule diameter and comprising a material selected from the class consisting of a non-ionizable water-soluble film-former and a hydrophobic water-insoluble film-former.

sheets or paper with a coating of micro-capsules. Claim 24 is representative here and set forth below.[3] It should be noted that under claim 24 the microcapsules applied to the paper are described as "being those defined by claim 11."

In its answer to Moore's complaint, 3M denied infringement and asserted as affirmative defenses that the Macaulay patent is invalid and that Moore is barred by laches from enforcing the Macaulay patent against 3M's Type 200 carbonless copying paper. In July 1973 3M moved for summary judgment solely on the ground of noninfringement. It based its argument on affidavits showing that 3M's capsules are formed in an aqueous solution, are maintained as a slurry in such aqueous solution, and are still in an aqueous solution when finally applied to paper. At no time do the capsules take the form of a free-flowing *powder.* On the other hand, 3M argued that claims 1 to 10 of the Macaulay patent by their terms describe a process for producing a free-flowing *powder* of microcapsules. Claims 11 through 22 are product claims directed toward a "free-flowing *powder* of microscopic discrete rupturable capsules . . .." (Emphasis added.) And claims 23–29 relate to copying paper coated with microcapsules, said capsules "being those defined by claim 11." 3M argued that claims 24 to 29, although not containing the words "free-flowing powder,"[4] are dependent on claim 11, and thus not only include the restrictions contained in claim 11 as to the chemicals from which the capsules' shell walls could be made, but also incorporate the reference in claim 11 to "free-flowing powder."

3M argued not only that its paper and processes do not come within the express language of the patent, but that file wrapper estoppel precluded Moore from arguing that there was still an issue of fact as to whether the Macaulay process and product claims were being infringed by 3M's Type 200 paper and the process for producing it. Absent such an estoppel, Moore could argue that 3M's processes, capsules, and copying paper were "equivalents" to those claimed in the Macaulay patent, and therefore infringing, even if 3M's capsules were never in the form of a free-flowing *powder* as allegedly required by the express language of the Macaulay patent claims. *See, e. g., Graver Tank Co. v. Linde Air Products Co.,* 339 U.S. 605, 608–09, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

On July 2, 1974, the district court granted summary judgment in favor of 3M. 384 F.Supp. 533 (W.D.N.Y.1974). The court, focusing on the specifications preceding the claims in the Macaulay patent, stated initially:

"The obvious thrust of the description of the Macaulay patent is to distinguish the process described in the Macaulay patent from the prior art as described in the Green patent[5]. . .

3. 24. A record copying sheet having on at least a portion of one side thereof a coating of microscopic discrete capsules comprising a rupturable shell containing therein a marking fluid capable of being liberated when the shells of said discrete capsules are ruptured upon being subjected to external pressure, said capsules being held to said sheet by a binder which is of a different substance from that forming the rupturable shell of said capsules, said microscopic discrete capsules being those defined by claim 11.

4. Claim 23 is similar to claim 24, except that it refers expressly to paper coated with free-flowing powder, rather than simply to micro-capsules. Like claim 24, however, claim 23 also incorporates the phrase, "said microscop-ic discrete capsules being those defined by claim 11."

5. The original Green patent (Green(1)) was issued in 1955. It taught a process for making a colloidial gel in which droplets of marking fluid were suspended. The continuous phase of the suspension was thicker or denser right around each droplet. Under pressure the gel would rupture and marking fluid would be released. When the paper coated with gel was folded, cracks in the film tended to run between the droplets because the film-former was thicker right around each droplet than it was between them.

Two other Green patents (Green (2) and (3)) were issued in July 1957, just two weeks before the Macaulay application was filed. They

While in the Green patent the walls of the capsule are produced in the aqueous solution, in the Macaulay patent the walls are produced when the component chemical materials are spray-dried. . . . By looking at the claims of the Macaulay patent, there can be no doubt that it is essential to the Macaulay process of producing microscopic capsules that they be produced by drying the component materials into a free-flowing powder. Each of the claims of the Macaulay patent calls for or depends upon a free-flowing powder of microscopic capsules. . . . *No claim of the Macaulay patent includes microscopic capsules formed in an aqueous solution.*"

*Id.* at 537 (emphasis added).

■ The court then noted that under the doctrine of file wrapper estoppel, if a patent applicant, after being refused a patent, amends his application to narrow the scope of his claims in order to obtain a patent, he cannot later charge infringement against a device which falls within the scope of the disclaimed or abandoned subject matter. *Id.* at 538, *citing Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 136–37, 62 S.Ct. 513, 86 L.Ed. 736 (1942). The court very generally traced part of the history of the Macaulay application, which was twice amended before being finally allowed. The court concluded, largely on the basis of arguments made by Moore's counsel to the patent examiner, that

"the entire thrust of the patent applicant's two revisions was to distinguish his process of producing microcapsules as a free-flowing powder from the process of producing microcapsules in aqueous dispersions. The conclusion seems inescapable that the patent office granted the Macaulay patent with the limitation that the process patented was the process of producing microcapsules by spray-drying. It is clear

from the proceedings before the patent examiner that the applicant intended to distinguish the process by which the shell wall is produced by drying from the process of producing the shell wall in aqueous dispersion." 384 F.Supp. at 540. The district court concluded that plaintiff was precluded from attempting to show that producing microcapsules in aqueous dispersions is equivalent to producing microcapsules as a free-flowing powder. It also found that the affidavits submitted by 3M raised no genuine issue of fact on the question of defendant's Type 200 paper infringing the Macaulay patent.

## II. Process Claim 8.

Moore argues on appeal that there is a disputed issue of fact as to whether 3M's process for producing microcapsules infringes claim 8 of the Macaulay patent, and that the district court erred in granting summary judgment with respect to claim 8. We agree.

The Macaulay patent, in claims 1 to 10, describes several processes for producing free-flowing powders of microcapsules. One is spray-drying an emulsion, with the shell walls being formed by evaporation forces acting upon the continuous phase of the emulsion as the emulsion is sprayed. Another is by triggering a chemical condensation reaction in an emulsion, and then filtering and drying the resultant microcapsules. The district court, in interpreting the Macaulay patent, seems to have read and interpreted the patent as if a single process were claimed, that of spray-drying. Thus the district court stated at one point, "[n]o claim of the Macaulay patent includes microscopic capsules *formed* in an aqueous system." 384 F.Supp. at 537 (emphasis added). However the process described in claim 8 (as amplified in Example IV of the Macaulay patent) describes just such a process, where the

---

improved upon the process taught in Green (1). Whereas in Green (1) the droplets of marking fluid were "trapped" in a gel, under Green (2) and (3) actual capsules were formed, with distinct shell walls (formed by coacervation) separating the droplets from the continu-

ous phase of the emulsion. The mixture could be applied directly to paper, or the capsules could be spray-dried into a powder which could be applied to paper with various binders to form a pressure-sensitive copying sheet.

capsules are formed in and harvested from an aqueous solution. And it is claim 8, rather than the claims directed toward spray-drying, which is alleged to be infringed.

 The district court, in finding Moore estopped from asserting infringement against a process where the capsules were formed and maintained in an aqueous solution, relied upon numerous statements made by Moore and contained in the file wrapper, distinguishing the Macaulay spray-drying process from the way in which spray-drying was used in the prior art (Green (2) and (3)). However, these statements relied upon by the district court are not relevant to the scope to be given to claim 8, which describes a very different process, not taught in any way by the prior Green patents, in which the capsules were formed in an aqueous solution.

In determining whether an estoppel applies, the court must consider whether an applicant abandoned or disclaimed coverage of certain processes or products in the course of securing its patent. Of primary importance in such a case are the original claims made by the applicant, the reasons given by the examiner for rejecting such claims, and the narrowing amendments made by the applicant in an attempt to secure approval of the patent. *See, e. g., Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In the present case, the term free-flowing powder was not added by amendment to narrow claim 8, but was contained in the initial Macaulay claim relating to producing microcapsules by chemical condensation, as well as in all the original Macaulay process claims. Thus we do not have a situation where an initial claim relating to chemical condensation, but not including the filtering and drying steps, was initially made by Moore, rejected by the patent examiner, and then narrowed by adding the filtering and drying steps. *Compare Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 136–37, 62 S.Ct. 513, 86

L.Ed. 736 (1942). Nor did Moore ever attempt to distinguish claim 8 from any similar process described in the prior art on the basis of the filtering and drying steps. Indeed, the significance of Macaulay's invention would seem to concern the use of a chemical condensation reaction to form discrete rupturable microcapsules for use in pressure-sensitive copying paper. The final filtering and drying steps appear to be obvious to any person who wanted to apply the capsules to paper without also applying the aqueous solution in which the capsules were formed. Indeed (as the examiner noted in rejecting some of the initial *product* claims made in the Macaulay patent and which referred to free-flowing powders), Green (3) taught that colloidial suspension containing microcapsules formed by coacervation (the Green process) could be spray-dried (or alternatively hardened and ground up to a powder), with the resulting powder applied to paper with various binders.[6]

The mere use of the term free-flowing powder in claim 8, as well as in the other Macaulay process claims, does not itself create an estoppel. One of the very purposes of the doctrine of equivalents is to give a patent claim a somewhat broader scope than it literally has, to the extent that the nature and circumstances of the invention warrant. Whether there is an estoppel to assert the doctrine of equivalents must be determined primarily on the basis of amendments made to the patent in the course of its prosecution.

Upon a review of the file wrapper, we are persuaded that it does not provide a basis for finding that Moore, in order to distinguish prior art and to secure approval of the Macaulay patent, abandoned or disclaimed coverage under claim 8 of a process for producing microcapsules which corresponded to claim 8 and Example IV of the Macaulay patent, except for the fact that the filtering and drying steps were omitted. Therefore, Moore is not estopped from asserting claim 8 against the 3M process under the

6. See note 5 supra.

doctrine of equivalents, merely because the 3M capsules are formed and maintained at all times in an aqueous solution.

As we find no estoppel with respect to claim 8, summary judgment was inappropriate if there is a disputed issue of fact as to whether 3M's process is equivalent to and therefore infringes claim 8. 3M, as the moving party, has the burden of showing an absence of any material factual issue requiring a trial. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir. 1971). In the present case, an affidavit by Dr. Dean A. Ostlie, a research manager at 3M, describes a number of differences as well as similarities between the Macaulay process (claim 8 and Example IV) and the 3M process. It appears that the 3M process involves a chemical condensation reaction in an emulsion, similar to the Macaulay process. In addition, the microcapsules formed have shell walls made of ureaformaldehyde polymers, as do the capsules made pursuant to Example IV. While the Ostlie affidavit also points out differences between the 3M and Moore chemical condensation processes, we find that the similarities are such that on the basis of this limited record, this affidavit does not demonstrate nonequivalence. We note that this affidavit, by a 3M employee, is to be construed in favor of Moore, who is opposing the motion for summary judgment. See *Adickes v. Kress & Co., supra,* 398 U.S. at 157, 90 S.Ct. 1598. Moreover, courts should be cautious in granting summary judgment on the issue of equivalence, especially where, as here, the prior art with respect to the invention asserted is not fully developed in the record and not readily understandable without expert testimony. Cf. *Vermont Structural Slate Co. v. Tatko Bros. Slate Co.*, 233 F.2d 9, 10 (2d Cir.), *cert. denied,* 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123 (1956); *Brass Craft Mfg. Co. v. Teledyne Corp.*, 180 U.S.P.Q.

486, 489 (D.Conn.1973). In part, this is because the extent to which a patent will be read beyond its literal terms depends to a large degree on the relationship of the invention to the prior art. *See, e. g., Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 94 L.Ed.2d 1097 (1950); *Triax Co. v. Hartman Metal Fabricators, Inc.*, 479 F.2d 951, 958 (2d Cir. 1973). We find there is a disputed issue of fact as to equivalence with respect to claim 8, and accordingly remand for further proceedings with respect to that claim.

### III. The Product Claims.

The basis for the district court's holding with respect to the asserted product claims is somewhat unclear. The court did state that Moore had not raised a question of fact with respect to infringement by the Type 200 paper. However, it may be that the district court also found an estoppel, which precluded Moore from asserting its patent against 3M capsules and paper. 3M, on appeal, has pressed its estoppel argument with respect to these claims; and Moore, in response, has argued that there is no estoppel created by the term free-flowing powder in the various product claims.

Initially, we focus on the construction to be given the asserted product claims, particularly product claims 23 to 29 which incorporate claim 11 by reference. Taking claim 24 as representative, it is 3M's position on this appeal that the only reason that claim 24 does not literally cover 3M's Type 200 paper is the closing phrase "said microscopic discrete capsules being those defined by claim 11," which was added by amendment to patent claim 24 during the course of the proceedings before the examiner. Claim 24 was originally application claim 15, and in all respects other than the above phrase, patent claim 24 is identical to application claim 15.

3M argues that Moore is estopped from claiming infringement by papers to

which capsules are applied in aqueous solutions, because of the dependence of claim 24 on claim 11 (which is directed toward a free-flowing powder). This, however, is hardly a result which follows from the language of claims 11 and 24. The only apparent restriction on the way in which capsules are to be applied to the paper covered by claim 24 is that the binder cannot be made of the same material as the shell wall. Claim 11 does not itself refer to the binder to be used when and if the powder claimed thereunder is applied to paper. Moreover, the patent specification suggests that Moore claimed simply that its discrete capsules *permitted* the use of nonaqueous binders. This is quite different from 3M's argument that Moore disclaimed coverage under the patent of papers coated with Macaulay capsules (which were allegedly better because made from more suitable chemicals) whenever an aqueous solution was used to apply the capsules to the paper. In Column 2, lines 62–68, the patent specification states that one object of the invention is to provide a powder "which does not require an aqueous coating system." In Column 8, lines 2–3, the specification provides that "[b]oth aqueous binders and nonaqueous binders may be employed. Since nonaqueous binders may be used, it is not necessary to employ expensive papers . . .."

Furthermore, there is no indication in the file wrapper that the examiner interpreted the patent as applying only to papers coated with capsules applied with nonaqueous binders. For the examiner, the significance of the reference to claim 11 was clearly the limitation on the chemicals to be used under the Macaulay patent. By amendment, Moore had expressly excluded capsules formed from chemicals which were suitable for use under the Green patents. This is reflected in the limitation in claim 11 that the shell wall must be comprised of a material "selected from the class consist-

ing of a non-ionizable water-soluble film-former and a hydrophobic water-insoluble film-former." In his order approving the claims presently in the patent, the examiner also directed Moore to modify the specification of the patent so that the brief summary of the invention and the descriptive matter were confined to the invention to which the allowed claims were directed. All references to such film-formers as gelatin, casein and zein (chemicals suitable for use under the Green patents) were ordered stricken from the specification.

█ As we interpret claim 24, and the other product claims relating to paper, we find that they literally cover paper with capsules applied in an aqueous solution.

█ 3M further argues that the term free-flowing powder, incorporated in claim 24 by the reference to claim 11, requires at least that the capsules being applied to paper have at one time been in powder form. Since 3M's capsules are *never in powder form*, 3M argues that Type 200 paper does not literally infringe the Macaulay patent. 3M also claims that since this limitation came as the result of a narrowing amendment of a rejected claim, Moore is estopped from asserting the doctrine of equivalents.

However, we believe that the product claims are not so limited. Although it is a general rule that a dependent claim (e. g., claim 24) incorporates all the restrictions of the base claim (claim 11),[7] it must first be determined to what extent the term free-flowing powder operates as a restriction in claim 11 itself.

An examination of the history of claim 11 convinces us that Moore is not precluded from asserting that claim (pursuant to the doctrine of equivalents) against capsules that are not formed initially as a powder or dried to powder form. As with the process claims discussed earlier, the original product

**7.** See *Zenith Radio Corp. v. Lehman,* 121 F.Supp. 69, 72 (S.D.N.Y.1954), *aff'd,* 217 F.2d 954 (2d Cir. 1955). See also Patent Office Rule 75(c), 37 C.F.R. § 1.75(c) (in force during the pendency of the Macaulay patent application, 1957–62). Rule 75(c) was codified by statute in 1965. See 35 U.S.C. § 112.

claims relating to capsules all referred to capsules in powder form. The term free-flowing powder was not added to any capsule claims by amendment. In addition, there is again no indication that the examiner attributed any significance to the fact that the capsule claims referred to powders rather than simply capsules. Nor does it seem that Moore itself attributed any special significance to the fact that powder was claimed, rather than simply capsules. Moore may well have referred to powder to emphasize that its capsules were independent of the solution in which they were formed. Such was not the case with the paper coating formed under Green (1).

As the term free-flowing powder in claim 11 does not preclude an infringement claim (based on equivalents) against similar capsules in an aqueous solution, Moore should not be precluded from asserting claim 24 against papers coated with capsules which have never been in powder form. Otherwise, a term in the base claim would operate as more of a restriction on the dependent claim than it does on the base claim itself. If the base claim can be extended by the doctrine of equivalents, then, at least in the circumstances of this case, the dependent claim can also be extended in comparable respects.

■ The question which remains is whether there is a disputed issue of fact with regard to the equivalence of the respective capsules and papers, making summary judgment inappropriate. As stated earlier, the burden was on 3M to introduce affidavits demonstrating that the 3M capsules and paper are nonequivalent to those made under the Macaulay claims and therefore do not infringe. 3M below relied primarily upon the fact that its microcapsules are applied in an aqueous solution, but the Macaulay pat-

ent, we hold, literally covers that. 3M also relied on the fact that its capsules were never in powder form, but it certainly is not evident that that would make the capsules and papers any different at all. There remains the Ostlie affidavit, referred to above on the question of equivalence between the respective processes. This affidavit also compares papers Dr. Ostlie produced following Example IV of the Macaulay patent and 3M's Matson patent. The district court did not rely on this affidavit in granting summary judgment for 3M, nor did 3M focus on it below. The affidavit, however, indicates that the Macaulay paper Dr. Ostlie produced pursuant to Example IV was deficient in several respects. Capsules made with minor variations in the process performed significantly better, but still not as well as those made pursuant to the Matson process.

■ Despite this affidavit, we are persuaded that the issue of equivalence is not foreclosed and that the best course is to remand for further proceedings, as we did with respect to the single process claim. The district court did not focus on equivalence in view of the differences noted in the Ostlie affidavit. In addition, the affidavit discloses similarities as well as differences between the capsules and papers (for example, the 3M capsules are of similar size to the Macaulay capsules, have shell walls made from ureaformaldehyde polymers, and appear to perform significantly better even when only minor variations are made in the Example IV process). In this situation, we are reluctant to find that the affidavit forecloses any question with respect to equivalence.

Accordingly, we reverse the order of the district court granting summary judgment for defendant 3M, and remand the case for further proceedings consistent with this opinion.